UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 06-CV-3893 (JFB) (AKT)

———————

Milton Abeles, Inc.,

Plaintiff,

versus

Creekstone Farms Premium Beef, LLC,

Defendant.

———————

Memorandum and Order
May 14, 2006

———————

Joseph F. Bianco, District Judge:

Plaintiff Milton Abeles, Inc. ("Abeles"), brings this action in diversity against Creekstone Farms Premium Beef, LLC ("Creekstone"), asserting claims related to Creekstone's alleged breach of an agreement with Abeles. Specifically, Abeles asserts the following claims against Creekstone under New York law: (1) breach of a joint venture agreement, (2) breach of a fiduciary duty, (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing, (5) unfair competition, and (6) breach of a quasi-contract.

Creekstone now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendant's motion is granted in part and denied in part.

I. Background

A. The Facts

The following facts are taken from the second amended complaint (the "complaint") and are not findings of fact by the Court, but rather are assumed to be true for purposes of deciding this motion and are construed in a light most favorable to plaintiff, the non-moving party.

On June 4, 2003, plaintiff Abeles allegedly entered into an oral agreement (the "agreement"), whereby Abeles agreed to expend time, money, and effort to promote and to sell Creekstone's meat products to several customers, and to serve as the exclusive source of Creekstone products to

such customers.[1] (Compl. ¶ 7.) Pursuant to the agreement, Abeles was to contribute its body of contacts, skill, knowledge, and reputation as a distributor of meat products to Creekstone's business (*Id.* ¶ 10); Creekstone agreed to aid Abeles' efforts by, among other things, timely and completely fulfilling any orders of its products placed by customers as a result of Abeles' work. (*Id.* ¶ 9.)

Under the agreement, Abeles was to assume the full risk of loss arising from a customer's failure to pay Abeles for Creekstone products that Abeles had purchased at the customer's request. (*Id.* ¶ 11.) Similarly, Creekstone was to assume the full risk of loss arising from non-payment by Abeles, and from any other expenses incurred as a result of demands made by one of the customers to whom Creekstone was introduced by Abeles. (*Id.*) According to plaintiff, the parties also agreed that Creekstone was to take the profit arising from the sale of its products to Abeles, and Abeles was to take the profit arising from the sale of such products to third-party customers. (*Id.* ¶ 12.)

Furthermore, plaintiff alleges that the parties shared management and control over their activities under the agreement. (*Id.* ¶ 13.) Specifically, plaintiff alleges that the parties jointly determined the following matters: (1) to which customers they would market Creekstone products; (2) where to advertise and market Creekstone products; (3) the manner in which they would present and market Creekstone products to prospective clients; (4) the forms of advertising media and payment of advertising fees; (5) the price of Creekstone products that would be sold to customers, so as to maximize the parties' profits; (6) the number and amount of payments and/or rebates to be made to Abeles in order to compensate Abeles for losses incurred as a result of lower prices offered by Abeles to new customers; and (7) the provision of certain rebates, rewards, coupons, credits, and discounts to customers under certain circumstances. (*Id.* ¶ 13.)

According to Abeles, on February 8, 2006, as a result of Abeles' efforts on behalf of Creekstone, Creekstone received purchase orders from a chain food store known as Wild by Nature, as well as other chain stores. (*Id.* ¶ 16.) However, Creekstone failed to timely and properly fulfill orders placed by Wild by Nature as a result of Abeles' efforts. (*Id.* ¶ 17.) Thereafter, in light of Creekstone's failure to fulfill such orders, Abeles made greater efforts to promote Creekstone's products and to convince Wild by Nature to continue to order Creekstone products. (*Id.* ¶ 18.)

On May 27, 2006, Abeles learned that Creekstone had been selling its products to Wild by Nature through another distributor. (*Id.* ¶ 20.) When Abeles brought this discovery to Creekstone's attention, Creekstone admitted that it was using another distributor and informed Abeles that Creekstone would no longer comply with its obligations under the agreement, including its obligation to sell its products to certain customers exclusively through Abeles. (*Id.* ¶¶ 21-22.) Thereafter, according to Abeles, Creekstone did not, in fact, comply with the terms of the agreement.

---

[1] Plaintiff is a New York corporation; defendant is a Delaware corporation.

Abeles characterizes the agreement as a "Joint Venture Partnership" (*Id.* ¶ 7), or, in the alternative, as an "oral distribution agreement," whereby Abeles served as the exclusive distributor of Creekstone's products to certain customers. (*Id.* ¶ 23)

### B. Procedural History

This case was originally filed in the Supreme Court of the State of New York, County of Nassau. On August 11, 2006, defendant removed the case to this Court. Plaintiff filed a second amended complaint on November 13, 2006. Defendant filed the instant motion on December 1, 2006. Oral argument was held on March 9, 2007.

### II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enterp.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). A complaint should be dismissed under Rule 12(b)(6) "'only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle him to relief.'" *Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 483 (2d Cir. 2007) (quoting *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004) (internal quotation marks omitted)). The appropriate inquiry is "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005).

### III. DISCUSSION

### A. The Joint Venture Claim

Plaintiff alleges that the parties entered into a joint venture agreement, and that defendant breached the agreement. As the Second Circuit has observed, under New York law:

> The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses.

*Brown v. Cara*, 420 F.3d 148, 159-60 (2d Cir. 2005) (quoting *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 584 (N.Y. App. Div. 2003)); *see also SCS Commc'ns, Inc., v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d. Cir. 2004). "The absence of any one factor 'is fatal to the establishment of a joint venture.'" *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citation omitted).

Here, defendant argues that plaintiff has failed to sufficiently allege facts in support of the first and fifth indicia cited above, regarding, respectively, the parties' intent and the sharing of profits and losses. For the reasons set forth below, the Court finds that plaintiff has adequately alleged the existence of a joint venture between the parties so as to

3

survive a Rule 12(b)(6) motion on this claim.[2]

First, the Court rejects defendant's argument that the joint venture claim must fail because plaintiff has not specifically alleged that the parties intended to enter into a joint venture. "[T]he intent of the parties, as one of the factors in determining whether a joint venture exists, may be express *or implied* . . . from the totality of the conduct alleged." *Richbell*, 765 N.Y.S.2d at 584 (citing *Mendelson v. Feinman*, 531 N.Y.S.2d 326, 328 (N.Y. App. Div. 1988)); *see SCS Commc'ns*, 360 F.3d at 342; *see also DIRECTV Group, Inc. v. Darlene Inv., LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, at *6 (S.D.N.Y. Sept. 27, 2006) ("[T]he term 'joint venture' need not be used in the parties' agreement to establish intent."). Here, the parties' intent to be joint venturers is sufficiently alleged in the complaint. Specifically, beyond the conclusory allegation that the parties had "the intent . . . to be associated as Joint Venturers," plaintiff alleges that the parties jointly determined, among other things, the price at which to sell their products, the manner in which to market them, and the customers to whom they would sell. (Compl. ¶¶ 13, 31.) Thus, the complaint sufficiently alleges conduct manifesting the parties' intent to commingle their interests, so that their "ongoing relationship based on mutual effort and shared goals [would] exceed[] the type of simple 'arms length purchase and sale' . . . that falls outside the definition of a joint venture." *Shore Parkway Assoc.*, 1993 WL 361646, at *2.

Second, the Court finds that plaintiff has sufficiently alleged the sharing of profits and losses so as to survive the instant motion. "An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (citing *Steinbeck v. Gerosa*, 151 N.E.2d 170, 178-79 (N.Y. 1958)). However, a joint venture does not require precisely *equal* sharing of profits and losses. *Richbell*, 765 N.Y.S.2d at 584 ("[W]e reject defendants' contention that a joint venture requires an equal sharing."); *see also Dundes v. Fuersich*, 791 N.Y.S.2d 893, 895 (N.Y. Sup. Ct. 2004) (citing *Richbell*, 765 N.Y.S.2d at 584).

Here, drawing all inferences in plaintiff's favor, the Court finds that the complaint sufficiently alleges that the agreement provides for a sharing of profits and losses arising from the parties' endeavor to market and to sell Creekstone products. As noted *supra*, plaintiff alleges that "the parties jointly agreed on their products' pricing so as to maximize profits to both parties." (Compl. ¶ 13.) According to plaintiff, this alleged provision indicates that the parties mutually agreed on the prices that plaintiff would charge for customers to purchase Creekstone products from plaintiff, and that such joint pricing decisions were made while both

---

[2] The Court notes that a joint venture agreement is not subject to the Statute of Frauds and, thus, is valid notwithstanding the absence of a written agreement. *Zeising v. Kelly*, 152 F.Supp.2d 335, 347 (S.D.N.Y. 2001) ("If the oral agreement entered into by the parties was a joint venture, it is not subject to the Statute of Frauds and therefore, may be enforceable.") (citing *Shore Parkway Assoc. v. United Artists Theater Circuit, Inc.*, No. 92 Civ. 8252 (JFK), 1993 WL 361646, at *3 (S.D.N.Y. Sept.14, 1993) ("[T]he fact that the alleged joint venture . . . was entered into orally does not jeopardize its status as a joint venture."), and *Campo v. First Nationwide Bank*, 857 F.Supp. 264, 272 (E.D.N.Y. June 30, 1994)).

4

parties were also aware of the price that Creekstone would charge for plaintiff itself to purchase such products. Thus, plaintiff contends that the joint pricing decisions may reasonably be construed as an agreement upon a formula for apportioning the profits of their endeavor. In other words, plaintiff argues that, because the parties mutually agreed upon the price that would be charged to plaintiff's customers, while also aware of the price charged to plaintiff, they effectively fixed the ratio of profits that would accrue to Creekstone – from the sale of its products to plaintiff – and to plaintiff – from the sale of Creekstone products to third-party customers. The Court finds, drawing all reasonable inferences in plaintiff's favor, that the alleged provision identified by plaintiff sufficiently alleges facts to support plaintiff's assertion that, pursuant to the agreement, the parties were to share profits arising from their endeavor.

As to the sharing of losses, the Court similarly finds, drawing all reasonable inferences in plaintiff's favor, that the complaint sufficiently alleges that, pursuant to the agreement, the parties were to share in some portion of the losses arising from their endeavor. The alleged agreement provides that each party assumed the risk of loss arising from their *individual* contributions to the venture – specifically, Creekstone assumed the risk of nonpayment by Abeles, and Abeles assumed the risk of nonpayment by the customers. (Compl. ¶ 11.) However, the assumption of such individual risks may not, by itself, sufficiently establish that the parties agreed to share the burden of losses arising from their endeavor, so as to distinguish the alleged agreement from a commonplace producer-distributor agreement. *See Steinbeck*, 151 N.E.2d at 179 ("[I]t is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders' agreement would give rise to a joint venture.").

Yet, the alleged agreement further provides that the parties would mutually agree (1) to confer certain "rebates," "credits," and "discounts" on some of their customers and (2) to make "payments and/or rebates" to plaintiff for its "losses incurred as a result of the necessity to negotiate a lower price structure to some potential customers in order to secure their business." (Compl. ¶ 13.) These alleged provisions, according to plaintiff, indicate that the parties agreed to jointly submit to the burden of certain losses arising from their endeavor. As to the alleged rebates, credits, and discounts to customers, plaintiff may be able to establish some set of facts demonstrating that these items effectively diminished the profits arising from the parties' endeavor by reducing the amount of payments from their customers. As such, plaintiff contends that these provisions establish that, in deciding upon the amount and the number of such "losses" to confer on customers, the parties mutually agreed as to how to divide, or share, the burden of such losses among themselves.

Furthermore, as to the alleged rebates and payments to be made to plaintiff in order to compensate plaintiff for the low prices it would offer to new customers, plaintiff argues that such payments could be reasonably construed in plaintiff's favor as evidence of an agreement to share losses. That is, pursuant to this provision, plaintiff and defendant would share in the "loss" arising from the low prices charged to new customers – plaintiff would bear the initial loss, and defendant, upon

5

compensating plaintiff, would share in some portion of that burden. As such, both parties would assume the risk that they would not recoup the loss that arose from offering discounts to new customers. The Court concludes, drawing all reasonable inferences in plaintiff's favor, that the complaint sufficiently alleges that "[b]oth parties stood to lose if the venture was unsuccessful, and both agreed to a formula that exposed them to considerable risks and liabilities." *See Shore Parkway Assoc.*, 1993 WL 361646, at *3.

In sum, accepting the allegations in the complaint as true and drawing all reasonable inferences therefrom in favor of plaintiff, plaintiff may be able to prove that "the parties have so joined their property, interests, skills, and risks" so that their "interests have been made subject to each of the others' actions, on the trust and inducement that each would act for their joint benefit."[3] *Kid Cloz*, 320 F. Supp. 2d at 171 (quoting *Zeising*, 152 F. Supp. 2d at 348 (internal citations omitted)). The Court is unable to conclude at this juncture that there are no set of facts which would entitle plaintiff to relief. Accordingly, the Court finds that plaintiff is entitled to offer evidence in support of its joint venture claim, and defendant's motion is denied as to this claim.

B. The Fiduciary Duty Claim

Because the Court found *supra* that the complaint sufficiently alleged the existence of a joint venture between the parties, it further finds that the complaint states a claim for the breach of a fiduciary duty. "Joint adventurers . . . owe to one another . . . the duty of the finest loyalty." *DIRECTV*, 2006 WL 2773024, at *5 (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)); *see, e.g., Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2006); *Gramercy Equities Corp. v. Dumont*, 531 N.E.2d 629, 633 (N.Y. 1988). Such a relationship "gives rise to a fiduciary duty on [the defendant fiduciary's] part to preserve and protect plaintiff's interest." *Gross v. Vogel*, 437 N.Y.S.2d 431, 433 (N.Y. App. Div. 1981); *see Shore Parkway Assoc.*, 1993 WL 361646, at *4 (finding that the complaint properly states a claim for breach of fiduciary duty based on the plaintiff's claim that the defendant breached a joint venture agreement); *Ebker v. Tan Jay International, Ltd.*, 741 F.Supp. 448,

---

[3] At oral argument on the instant motion, defendant's counsel asserted that he had "yet to see a case that describes a distributorship relationship as a joint venture." (Tr. at 5.) However, there is no *per se* rule against the existence of a joint venture wherein the parties join together to distribute goods produced by one party, at least where the parties stipulate as to its existence or a court finds that the indicia of such an agreement are otherwise present. *See, e.g., Kitty Walk Sys., Inc. v. Midnight Pass Inc.*, 431 F. Supp. 2d 306, 307 (E.D.N.Y. 2006); *New Sensor Corp. v. CE Distrib. LLC*, 367 F. Supp. 2d 283, 285 (E.D.N.Y. 2005); *Imtrac Indus., Inc. v. Glassexport Co., Ltd.*, No. , 1996 WL 39294, at *2 (S.D.N.Y. Feb. 1, 1996) ("In furtherance of this joint venture, [plaintiff] was granted the exclusive distributorship of certain glassware products manufactured by the [] defendants."); *Sanders v. Boelke*, 569 N.Y.S.2d 272, 273 (N.Y. App. Div. 1991) ("[The parties] orally agreed to enter into a joint venture for the design, manufacture, assembly and distribution of electronic products."); *see also Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 678-79 (3d Cir. 1991) ("The writings here demonstrate that the parties did not articulate a series of distinct, unrelated, simple buy and sell arrangements, but contemplated what resembles in some respects a joint venture or a distributorship.") (internal citation omitted).

468 (S.D.N.Y.1990); *see also Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989) ("This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.") (citation omitted). Here, plaintiff states a claim for breach of a fiduciary duty by alleging that defendant used a distributor other than plaintiff to sell products to Wild by Nature, thus failing to abide by the alleged terms of the parties' joint venture agreement.

### C. The Contract Claim

Plaintiff asserts, as an alternative to the joint venture claim, that the parties made an oral contract whereby plaintiff would be the exclusive distributor of Creekstone products to certain stores, and that Creekstone breached this contract. Defendant argues that the contract claim must fail because the alleged agreement runs afoul of the Statute of Frauds set forth in Section 2-201(1) of the New York Uniform Commercial Code (the "UCC Statute") or, in the alternative, the Statute of Frauds set forth in Section 5-701 of New York General Obligations Law ("Section 5-701"). For the reasons set forth below, drawing all reasonable inferences in favor of plaintiff, the Court is unable to determine at this stage whether the UCC Statute, which would bar enforcement of the contract, or Section 5-701, which would *not* bar enforcement if the contract could be performed within one year, applies to the contract. Therefore, because it is not beyond doubt that the contract claim is barred, plaintiff's contract claim cannot be dismissed on this basis at this juncture.

### 1. The UCC Statute

The UCC Statute applies to any contract for the sale of goods exceeding $500, and requires that such an agreement be in writing. N.Y. U.C.C. § 2-201(1); *see, e.g., Rosenfeld v. Basquiat*, 78 F.3d 84, 93 (2d Cir. 1996); *Huntington Dental & Med. Co., Inc. v. Minn. Mining and Mfg. Co.*, No. 95 Civ. 10959 (JFK), 1998 WL 60954, at *4 (S.D.N.Y. Feb. 13, 1998); *United Beer Distrib. Co. v. Hiram Walker, Inc.*, 557 N.Y.S.2d 336, 337 (N.Y. App. Div. 1990) ("[Section 2-201(1)] has been held to apply to distributorship agreements which necessarily involve the purchase of more than $500 of goods."). The alleged contract in this case necessarily involved the purchase of more than $500 of goods. Accordingly, under the UCC Statute, plaintiff could not enforce the entirety of alleged contract absent a writing signed by defendant.

However, the UCC Statute also provides that "[a] contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . with respect to goods for which payment has been made and accepted or which have been received and accepted." N.Y.U.C.C. § 2-201(3)(c); *see also id.* cmt. 2 ("'Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted."). Therefore, the portion of the alleged contract that was partially performed – namely, where orders for goods had already been accepted by plaintiff, or payments for goods had already been made by plaintiff – is enforceable under the UCC Statute.

7

### 2. Section 5-701

Under Section 5-701, an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing. N.Y. Gen. Oblig. Law § 5-701(a)(1). As the Second Circuit has observed:

> This provision of the Statute of Frauds encompasses "only those contracts which, by their terms, 'have absolutely no possibility in fact and law of full performance within one year.'" *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998) (quoting *D&N Boening v. Kirsch Beverages*, 472 N.E.2d 992, 993 (N.Y. 1984). . . . Thus, "full performance by all parties must be possible within a year to satisfy the Statute of Frauds." *Id.* [at 59.] If an agreement may be fairly and reasonably interpreted to permit performance within a year, the Statute of Frauds will not bar a breach of contract action no matter how improbable it may be that performance will actually occur within that time frame. *Id.* at 58 (collecting cases).

*Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). Plaintiff argues that the contract claim satisfies the standard enunciated in *Guilbert* because, on the basis of the complaint, it cannot be said that there is "absolutely no possibility in fact and law of full performance within one year." *Id.* Specifically, according to plaintiff, although the alleged contract was of indefinite duration, it could have been fully performed within one year if one party had given reasonable notice of its decision to withdraw from the contract, and, subsequently, that party had terminated the contract. Therefore, although plaintiff concedes that the complaint "is silent on the issue of termination" (Pl.'s Br. at 16) and fails to allege that the contract included any term providing for its termination within one year, this Court declines to dismiss plaintiff's claim at this early stage of the case, prior to discovery, and before plaintiff has had an opportunity to demonstrate whether there was, in fact, some way, other than a breach of the contract, by which the alleged contract could be terminated within one year.

Defendant argues that the alleged contract is unenforceable under Section 5-701 because the contract, by its terms, "continues for an indefinite period." (Def.'s Reply Br., at 6.) Under New York law, contracts of indefinite duration that do not include an *express* term indicating that they are terminable within a year are sometimes deemed to be incapable of being performed within a year and, thus, fall within the ambit of Section 5-701. *See Burke v. Bevona*, 866 F.2d 532, 539 (2d Cir. 1989) ("[A] termination provision must be express . . . in order to excuse a contract from the writing requirement of the [Section 5-701] Statute of Frauds.") (quotations and citation omitted); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 472 N.E.2d 992, 995 (N.Y. 1984) (finding, at the motion to dismiss stage, that, "[c]learly, termination of an agreement as a result of its breach is not performance thereof within the meaning of the Statute of Frauds, and an oral agreement which by its own terms must continue for more than a year unless terminated by its breach is void").

However, New York law also provides for several exceptions to this rule. As set forth by the New York Court of Appeals in *D&N Boening* – a case cited with approval by the Second Circuit in *Guilbert* – even a contract of indefinite duration may not be barred by Section 5-701 if, for example, it is

8

"an agreement where, at any time, one or both parties could discontinue their activities, or reject any or all particular transactions, . . . or determine for any just or sufficient reason that termination was necessary for the good of the business." *D&N Boening, Inc.*, 472 N.E.2d at 995 (citations omitted); *see North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 239 N.E. 2d 189, 191 (N.Y. 1968) ("[I]t is clear that the agreement asserted by the plaintiff does not fall within the ban of [Section 5-701]. Although the parties may have expected the [alleged exclusive distribution] agreement to last over a long period, they contemplated its possible termination by action – unquestionably within the defendant's power to take at any time – discontinuing its [] sales in the New York area. That being so, the agreement did not, by its terms, of necessity extend beyond one year from the time of its making.") (internal quotation marks and citation omitted); *see also Weisse v. Engelhard Minerals & Chem. Corp.*, 571 F.2d 117, 119 (2d Cir. 1978) ("The practice of the New York courts has been to construe this one-year provision of the statute narrowly to give effect to oral contracts which are capable of being performed within one year. Thus, the one-year provision has been held to bar enforcement of oral contracts only in those cases where the contract is 'by express stipulation not to be performed within a year" and not to cases 'in which the performance of the agreement depends upon a contingency which may or may not happen within the year.'") (quoting *North Shore*, 239 N.E.2d at 191); *Rail Eur. v. Rail Pass Express*, No. 94 Civ. 1506 (PKL), 1996 U.S. Dist. LEXIS 4183, at *12 (S.D.N.Y. April 3, 1996) ("Since the agreement could be terminated by either party in less than a year, it falls outside of the Statute of Frauds.") (citations omitted). In the instant case, drawing all inferences in plaintiff's favor, it is not beyond doubt that,

with regard to the instant alleged contract, there is "absolutely no possibility in fact and law of full performance within one year." *Guilbert*, 480 F.3d at 151. Therefore, at this time, the Court cannot find that Section 5-701 bars plaintiff's contract claim.[4]

Thus, the viability of plaintiff's contract claim hinges upon which provision applies: the UCC Statute or Section 5-701. "In deciding whether a contract is for the sale of goods, and thus plainly covered by the UCC, courts look to the main objective of the contract." *GE v. VARIG S.A.*, No. 01 Civ. 11600 (RJH) (JCF), 2004 U.S. Dist. LEXIS 1842, at *10 (S.D.N.Y. Feb. 6, 2004) (citation omitted); *see Consol. Edison Co. of New York, Inc. v. Westinghouse Elec. Corp.*, 567 F. Supp. 358, 361 (S.D.N.Y. 1983) ("In deciding whether a contract is one for the sale of goods or for the rendition of services, New York courts look to 'the main objective sought to be accomplished by the contracting parties.'") (quoting *Ben Construction Corp. v. Ventre*, 257 N.Y.S.2d 988, 989 (N.Y. App. Div. 1965)). At this time, drawing all reasonable inferences in favor of plaintiff, the Court is unable to conclude that the "main objective" of the alleged contract was the sale of goods, rather than the provision of plaintiff's services in promoting Creekstone meat products and cultivating new customers for such products. Therefore, because it is not beyond doubt that the UCC Statute applies and bars plaintiff's contract claim, plaintiff's claim cannot be

---

[4] Having determined that Section 5-701 does not bar plaintiff's contract claim at the motion to dismiss stage, the Court declines to consider whether the contract at issue can be removed from the writing requirement of Section 5-701 by the doctrine of partial performance.

9

dismissed on this basis.[5]

D. The Implied Covenant of Good Faith and Fair Dealing Claim

Plaintiff also alleges that defendant breached the covenant of good faith and fair dealing implied in every contract, including the instant agreement. The claim rests entirely on the alleged breaches of the oral contract at issue in the contract claim discussed *supra*. Thus, the claim for a breach of the covenant of good faith and fair dealing is dismissed as duplicative of plaintiff's cause of action for a breach of contract. *See, e.g., Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *TVT Records v. Island Def Jam Music Group*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. Feb 13, 2003) ("[A] claim for breach of the covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract.") (quotation marks and citation omitted); *see also Alter v. Bogoricin*, No. 97 CV 0662, 1997 WL 691332, at * 7 (S.D.N.Y. Nov. 06, 1997) ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative"); *Apfel v. Prudential-Bache Sec., Inc.*, 183 A.D.2d 439 (N.Y. App. Div. 1992) 583 N.Y.S.2d 386, 387 (N.Y. App. Div. 1992) ("The cause of action alleging a breach of good faith is duplicative of a cause of action alleging breach of contract, since every contract contains an implied covenant of good faith and fair dealing.").

E. The Unfair Competition Claim

Plaintiff also alleges that defendant's sale of Creekstone products to certain customers constitutes unfair competition under New York common law. "[T]he essence of unfair competition claims under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir.1995) (citations omitted).

Here, plaintiff asserts that defendant has "taken advantage" of plaintiff's efforts to promote Creekstone products and to cultivate new customers by using other distributors to sell Creekstone products in markets, and to customers, previously cultivated by plaintiff. (Pl.'s Br., at 19.) However, "[c]ourts considering unfair competition and misappropriation claims have consistently rejected such a protectionist application of the law, holding that 'one can capitalize on a market . . . created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.'" *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) (quoting *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 662 (2d Cir.1979)) (collecting cases). Plaintiff fails to offer any persuasive argument or cite any controlling decision indicating that this rule should not apply in the instant case.

---

[5] Of course, defendant may seek to have the Court revisit this issue at a later stage of the case in connection with a summary judgment motion once discovery is complete.

Accordingly, because the complaint fails to allege that defendant's conduct was likely to cause confusion or to deceive purchasers as to the origin of its goods, plaintiff's claim for unfair competition is dismissed.

### F. The Quasi-Contract Claims

Plaintiff also asserts claims for unjust enrichment and *quantum meruit*, which may be analyzed as a single quasi-contract claim. *See, e.g., Mid-Hudson Catskill Rural Migrant Ministry, Inc. v.* , 418 F.3d 168, 175 (2d Cir. 2005) ("Applying New York law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim.") (citing *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir.1996)); *Atla-Medine v. Crompton Corp.*, 2001 WL 170666, at *8 (S.D.N.Y. Feb. 21, 2001); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F.Supp. 89, 96 (S.D.N.Y.1991) (explaining that "quantum meruit and unjust enrichment are not separate causes of action," and that "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract"), *rev'd on other grounds*, 959 F.2d 425 (2d Cir.1992)). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (citation and internal quotation marks omitted)); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

The Court finds that plaintiff has adequately pled, as an alternative theory of liability, a quasi-contract claim. Specifically, plaintiff alleges that it expended considerable time and effort to promote Creekstone products and to cultivate new customers for defendant, thus conferring a benefit on defendant – namely, placing defendant in a position "to exploit a market that has been created for its products through the efforts of [plaintiff]" – which defendant knowingly accepted. (Compl. ¶ 68.) Thus, the Court finds that, drawing all reasonable inferences in plaintiff's favor, plaintiff may establish that its course of dealing with defendant established a quasi-contractual relationship wherein plaintiff reasonably expected compensation for its services and, as such, may be entitled to recover for benefits conferred upon defendant.

Defendant argues that plaintiff's quasi-contract claim must fail because (1) the complaint fails to establish the value of services allegedly rendered for defendant, (2) plaintiff's efforts were essentially for its own benefit and that any benefit bestowed upon defendant was incidental, and (3) plaintiff admits that it has already been paid for services allegedly rendered to defendant. However, at this time, the Court, accepting the complaint as true and drawing all reasonable inferences in plaintiff's favor, is unable to draw any of the conclusions urged by defendant.[6]

---

[6] The Court notes that, as to both of plaintiff's quasi-contract claims, they may only be asserted in the absence of an agreement between the parties – be it oral, written or implied-in-fact. *See, e.g., Beth Israel*, 448 F.3d at 586 (citing *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742 (N.Y. 2005)). Therefore, if this Court were to find, at a later stage of this litigation, that a "valid and

11

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss is GRANTED as to plaintiff's breach of the implied covenant of good faith and fair dealing claim and the unfair competition claim. Defendant's motion is DENIED as to plaintiff's remaining claims. The parties shall proceed with discovery forthwith in accord with the individual rules of Magistrate Judge A. Kathleen Tomlinson.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 14, 2007
Central Islip, New York

\* \* \*

The attorney for plaintiff is Steven L. Levitt, Esq., Steven L. Levitt & Associates, P.C., Two Hillside Avenue, Building F, Williston Park, New York 11596. The attorney for defendant is Matthew Solum, Esq., Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022.

---

enforceable" agreement governed the subject matter at issue in plaintiff's quasi-contract claims, such claims would be barred, at least to the extent the quasi-contract claims sought recovery for benefits conferred upon defendant during the pendency of an agreement between the parties. *Id.* However, the Court declines to consider this issue upon consideration of a Rule 12(b)(6) motion, wherein its sole concern is whether plaintiff is entitled to offer evidence as to the claims presented, and not to resolve the merits of plaintiff's contract or quasi-contract claims. *See Nakamura v. Fujii*, 677 N.Y.S.2d 113, 116 (N.Y. App. Div. 1998) ("[W]here, as here, a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories.").