# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 06-CV-3893 (JFB) (AKT)

————————————

MILTON ABELES, INC.,

Plaintiff,

VERSUS

CREEKSTONE FARMS PREMIUM BEEF, LLC,

Defendant.

————————————

**MEMORANDUM AND ORDER**
March 30, 2009

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Milton Abeles, Inc. ("Abeles" or "plaintiff") brings this action in diversity[1] against Creekstone Farms Premium Beef, LLC ("Creekstone" or "defendant"), asserting claims related to Creekstone's alleged breach of an agreement with Abeles. Specifically, Abeles asserts the following claims against Creekstone

under New York law:[2] (1) breach of a joint venture agreement; (2) breach of contract; (3) breach of fiduciary duty; and (4) quasi-contract.[3] Abeles seeks a sum to be

---

[1] Abeles is a New York corporation with its principal place of business located in Port Washington, New York. (Defendant's Local Rule 56.1 Statement of Facts in Support of Its Motion for Summary Judgment ("Def.'s 56.1") ¶ 1.) Creekstone is a Delaware corporation with its sales and processing center located in Arkansas City, Kansas. (*Id.* at ¶ 5.)

[2] In exercising its diversity jurisdiction, the Court must "apply the substantive law of the state to which the forum state, New York, would have turned had the suit been filed in state court." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 280 (2d Cir. 1981) (citations omitted). Because the plaintiff is from New York and the transactions at issue took place in New York, this Court properly applies New York law. *See Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 n.4 (2d Cir. 1981).

[3] Plaintiff's original complaint also brought claims for breach of implied covenant of good faith and fair dealing and unfair competition, but those claims were dismissed by this Court on

determined by the Court but believed to be ten million dollars, in addition to punitive damages and attorney's fees. Creekstone, in turn, has brought a counter-claim against Abeles, alleging the following claims, all under New York law with the exception of the fourth claim: (1) goods sold and delivered; (2) *quantum meruit*; (3) fraud; (4) violation of the Packers and Stockyards Act of 1921 ("PSA"); and (5) breach of fiduciary duty and/or exclusive distributorship agreement, presuming that the Court determines that such an agreement exists. Creekstone seeks a sum to be determined by the Court but no less than the alleged balance of $703,765.00 owed, in addition to punitive damages, prejudgment interest on both amounts, and attorney's fees.

Creekstone now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment granting its first and fourth counterclaims, dismissing Abeles' claims in their entirety, and awarding attorney's fees as well as prejudgment interest on the amount owed. Abeles cross-moves for partial summary judgment dismissing Creekstone's first and fourth counterclaims and striking Creekstone's expert report from the record. For the reasons set forth below, the motions by Creekstone and Abeles are denied in their entirety. Both parties have raised genuine issues of material fact on all of the claims and counterclaims, thus precluding the Court from ruling that the claims succeed or fail as a matter of law.

---

May 14, 2007. *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06 Civ. 3893 (JFB) (AKT), 2007 WL 1434990, at *8-*9 (E.D.N.Y. May 14, 2007). Plaintiff's claims of unjust enrichment and *quantum meruit* were considered as one quasi-contract claim by this Court in that same decision. *Milton Abeles, Inc.*, 2007 WL 1434990 at *9. Familiarity with this decision is presumed.

## I. BACKGROUND

### A. Facts

The facts relevant to the instant motions are set forth in the discussion section. They are taken from the parties' depositions, affidavits, exhibits, and from the parties' respective Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### B. Procedural History

On July 11, 2006, Abeles filed its complaint in this action before the Supreme Court of the State of New York, Nassau County. On August 11, 2006, Creekstone removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. On November 20, 2006, Abeles filed its second amended complaint, asserting claims of: (1) breach of a joint venture partnership; (2) breach of fiduciary duty; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) conduct amounting to unfair competition; (6) unjust enrichment; and (7) *quantum meruit*. On December 1, 2006, Creekstone filed a motion to dismiss Abeles' second amended complaint in its entirety. The Court dismissed Abeles' fourth and fifth claims and combined its sixth and seventh claims in a Memorandum and Order issued on May 14, 2007. *See Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06 Civ. 3893 (JFB) (AKT), 2007 WL 1434990, at *8-*9 (E.D.N.Y. May 14, 2007). On May 29, 2007, Creekstone answered the complaint and filed a counterclaim, asserting claims of: (1) goods sold and delivered; (2) *quantum meruit*; (3)

fraud; (4) violation of the Packers and Stockyards Act; and (5) breach of fiduciary duty and/or exclusive distributorship agreement. Abeles answered Creekstone's counterclaim on June 18, 2007. Creekstone moved for partial summary judgment on May 23, 2008. On June 23, 2008, Abeles filed its opposition and cross-moved for partial summary judgment. On July 14, 2008, Creekstone filed its opposition to Abeles' cross motion and its reply. On July 31, 2008, Abeles filed its reply. Oral argument was held on November 4, 2008. On November 18, 2008, defendant submitted a letter and declaration pursuant to the Court's direction. Plaintiff responded on November 21, 2008. This matter is fully submitted.

## II. DISCUSSION

### A. Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that summary judgment is unwarranted

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### B. Creekstone's Motion for Summary Judgment Dismissing Abeles' Claims

As stated *supra*, Creekstone brings the instant motion for summary judgment

seeking dismissal of Abeles' remaining claims, which arise from Creekstone's breach of an alleged agreement between the parties for the marketing and distribution of Creekstone's beef product.

1. Facts Alleged by Abeles[4]

Abeles has asserted that, in or around May of 2003, the parties entered into a joint venture partnership wherein Abeles would promote Creekstone's products by selling them to chain stores and customers to which Creekstone had not previously had access. (Plaintiff's Local Rule 56.1 Statement of Facts in Opposition to the Motion for Summary Judgment ("Pl.'s 56.1") ¶¶ 44-45; R. Abeles Decl. ¶ 3.) Abeles would utilize its host of business contacts in furtherance of the joint venture and Creekstone would fulfill all orders placed by customers as a result of Abeles' efforts in a timely manner. (R. Abeles Decl. ¶ 3.) The parties agreed that Abeles would enjoy the profits from selling Creekstone beef to Abeles' customers and Creekstone would enjoy the profits from selling its beef to Abeles. (Pl.'s 56.1 ¶¶ 62-63.) Accordingly, representatives from the two parties discussed the prices that Creekstone would charge to Abeles and Abeles, in turn, would charge to third parties. (*Id*. ¶¶ 47, 55-56.) It was further agreed that Abeles would assume the loss of non-payment from its customers and Creekstone assumed the loss of non-payment from Abeles. (*Id*. ¶ 69.) The parties then devised a joint marketing scheme, targeting specific customers in specific geographic areas, and agreed upon certain rebates, rewards, coupons, discounts and credits to be applied to certain customers under certain circumstances. (*Id*. ¶ 52; Plaintiff's Opposition Memorandum of Law ("Pl.'s Opp."), Exs. 11-12, 14-15, 18-19, 21, 28.) Specifically, the initial intended geographic scope of the venture was New York, New Jersey, Connecticut and Las Vegas with the option to expand to further markets on a case-by-case basis as such opportunities presented themselves. (Pl.'s 56.1 ¶¶ 82-83.) Richard Abeles, president of Milton Abeles, LLC, only shared the terms of this agreement with other employees on a "need-to-know" basis. (*Id*. ¶ 46). As a result of these marketing efforts, Abeles alleges that customers such as the food chain stores Balducci's and Price Chopper understood that Abeles and Creekstone were working together to "jointly price the product." (*Id*. ¶ 47; T. Touissant Decl. ¶ 4; Pl.'s Opp., Ex. 28.)

Pursuant to this alleged agreement, Abeles ordered approximately $30 million dollars worth of Creekstone beef over a period of approximately three years, from June of 2003 through May of 2006. (Pl.'s 56.1 ¶¶ 8, 11.) On or about February of 2006, Wild By Nature, a chain store affiliate of the supermarket corporation King Kullen, began placing orders for Creekstone beef through Abeles, pursuant to Abeles' efforts, (*id*. ¶¶ 34-35), orders which Creekstone frequently supplied late and with significant shortages. (*Id*. ¶¶ 38-39.) It is undisputed that on or about May 27, 2006, Abeles learned that Creekstone was selling beef to Wild By Nature through another distributor, Bozzuto's, Inc. (Def.'s 56.1 ¶ 41.) Abeles contends that in selling its product through Bozzuto's, Inc., Creekstone violated the terms of the alleged agreement between the parties by exploiting a contact cultivated by Abeles and selling to a distributor other than Abeles. (Pl.'s 56.1 ¶ 41.) It is undisputed that Abeles then discontinued its orders of Creekstone beef and refused payment for

_____

[4] Unless otherwise specified, the facts cited are disputed between the parties.

balances outstanding, as discussed *infra* in the analysis of Creekstone's "goods sold and delivered" counterclaim. (Def.'s 56.1 ¶¶ 22-23.)

It is further undisputed between the parties that while Abeles was purchasing Creekstone beef, it was also purchasing beef products from other suppliers; however, Abeles maintains that these products were not competitive with Creekstone, as Creekstone sold "Natural Black Angus boxed beef only," while the other suppliers dealt in "carcass beef." (Pl.'s 56.1 ¶ 89.) Therefore, according to Abeles, the fact that Abeles sold beef products supplied by other parties did not infringe upon the agreement that it had with Creekstone.

### 2. Facts Alleged by Creekstone

Creekstone, in turn, submits that no joint venture or exclusive distributorship agreement ever existed between the parties and, therefore, its decision to sell its product through Bozzuto's, Inc. could not have breached any agreement. Specifically, Creekstone asserts that there was no intent to form such a venture between the parties – a necessary element of a joint venture claim – as evidenced by the fact that first, no individuals at Creekstone intended to form any joint venture with Abeles, (D. Stewart Decl. ¶ 14), second, it is undisputed that even Richard Abeles, President of the Company, was uncertain if he had ever mentioned to any individual at his company that a joint venture and/or exclusive distributorship agreement governed the arrangement between the parties, (Def.'s 56.1 ¶ 46), and third, no outside parties were aware of the terms of the alleged joint venture. (*Id.* ¶ 47.) Moreover, Creekstone argues that it is undisputed that other indicia of a joint venture and/or exclusive distributorship agreement, such as – (1) joint tax returns (*id.* ¶ 72); (2) a common bank account

(*id.* ¶ 73); (3) a common board of directors (*id.* ¶ 75); (4) a separate corporate name (*id.* ¶ 74); or (5) sharing of customers' identities (Solum Decl., Ex. Y) – were conspicuously absent between the parties during the relevant time period.

Creekstone further asserts that the parties never agreed to share profits and losses, another core component of a joint venture agreement, as it is undisputed that Richard Abeles was unaware of whether Creekstone profited in its sales to Abeles. (Def.'s 56.1 ¶ 62.) Further, he was unable to discuss shared losses incurred by alleged rebates, coupons and discounts conferred to third parties. (*Id.* ¶ 70.) In that vein, Creekstone notes that Richard Abeles testified first, that the price at which Creekstone sold its product to Abeles was, "generally speaking," "predicated on . . . the status of its inventory," (R. Abeles Dep. at 45:20-46:9), and second, that he did not review the lists of prices charged to third parties with Creekstone "item for item." (*Id.* at 140:19.)

Further, defendant argues that no joint agreement could have existed because the terms alleged by plaintiff are so indefinite as to render the contract unenforceable. Specifically, defendant argues that there is no evidence of Creekstone's financial share from the venture, aspirational or otherwise, and the evidence of Abeles' share is conflicted, at best, as Richard Abeles testified that the goal was 10% but neither he nor Abeles' expert could verify the accuracy of that projection. (Def.'s 56.1 ¶¶ 78-79.) Further, Abeles could not pinpoint a specific geographic scope for the alleged agreement, offering first that it was "contiguous with [its] contacts and distribution sources in New York, New Jersey, Connecticut, and elsewhere," (*id.* ¶ 82), then stating that it was

on a "case-by-case basis," (*id.* ¶ 83), and ultimately suggesting that it was "throughout the United States." (*Id.* ¶ 84.) Creekstone also asserts that Abeles was uncertain of how many entities were party to the alleged agreement, namely, whether its "utensil," Milton Abeles, LLC, was a joint venturer as well, because Richard Abeles first testified that the entity was not a party to the agreement but Abeles' expert calculated sales by that entity in his damages analysis. (*Id.* ¶¶ 86-88.)

Finally, according to Creekstone, Abeles' purchase of tens of millions of dollars of beef product from other meat suppliers that was distributed in the same geographic area as Creekstone beef during the relevant time period belies its assertion that Abeles and Creekstone had formed a joint venture and/or exclusive distributorship relationship. (*Id.*¶ 91.)

### 3. Application

#### a. Breach of Joint Venture

Creekstone seeks summary judgment on Abeles' first claim that Creekstone breached a joint venture agreement and/or exclusive distributorship agreement between the two parties. Creekstone submits that the alleged agreement fails as a matter of law because the parties lacked the requisite intent to form a joint venture, there was no sharing of profits and losses between the parties, and the alleged agreement was too indefinite to be enforceable. Because there are disputed issues of material fact on all of the aforementioned issues, the Court cannot determine as a matter of law that there was no such agreement or resultant breach and, therefore, summary judgment must be denied.

As the Second Circuit has observed, under New York law:

The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses.

*Brown v. Cara*, 420 F.3d 148, 159-60 (2d Cir. 2005) (quoting *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 584 (N.Y. App. Div. 2003)); *see also SCS Commc'ns, Inc., v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d. Cir. 2004). "The absence of any one element 'is fatal to the establishment of a joint venture.'" *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citation omitted). The Court will examine each of these elements in turn.

##### i. Intention to Form a Joint Venture

Parties can evince their intent to be bound in a joint venture through a written or oral agreement. *See id.*; *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001) ("If the oral agreement entered into by the parties was a joint venture, it is not subject to the Statute of Frauds and therefore, may be enforceable.") (citing *Shore Parkway Assoc. v. United Artists Theater Circuit, Inc.*, No. 92 Civ. 8252 (JFK), 1993 WL 361646, at *3 (S.D.N.Y. Sept. 14, 1993) ("[T]he fact that the alleged joint venture . . . was entered into orally does not jeopardize its status as a joint venture."), and *Campo v. First Nationwide*

*Bank*, 857 F. Supp. 264, 272 (E.D.N.Y. June 30, 1994)). Intent need not be express, but "may be . . . implied . . . from the totality of the conduct alleged." *Richbell*, 765 N.Y.S.2d at 584 (citing *Mendelson v. Feinman*, 531 N.Y.S. 2d 326, 328 (N.Y. App. Div. 1988)); *see SCS Commc'ns*, 360 F.3d at 342; *see also Sea Carriers Corp. v. Empire Programs, Inc.*, No. 04 Civ. 7395, 2008 U.S. Dist. LEXIS 49205, at *32 (S.D.N.Y. June 24, 2008); *DIRECTV Group, Inc. v. Darlene Inv., LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, at *6 (S.D.N.Y. Sept. 27, 2006). Indeed, where the alleged agreement is oral, parties may demonstrate their intent by combining their property and efforts in a manner such that they are necessarily subject to their joint venturers' corresponding efforts and potential failures. *See Kid Cloz, Inc.*, 320 F. Supp. 2d at 171 (citing *Zeising*, 152 F. Supp. 2d at 348).

Creekstone argues that the undisputed facts demonstrate that the parties lacked the requisite intent to form the joint venture and, thus, there was no agreement as a matter of law. However, the only *undisputed* facts in the record that bear on this issue are: (1) Richard Abeles did not specifically characterize the agreement with Creekstone as a joint venture to his employees; and (2) the parties did not file a joint tax return or establish a board of directors, bank account or separate name for the alleged venture.

Regarding the first fact, the Court notes that if "the term 'joint venture' need not be used in the parties' agreement to establish intent," *DIRECTV Group, Inc.*, 2006 U.S. Dist. LEXIS 69129, at *17, Richard Abeles' failure to characterize the agreement as such to his employees should not preclude the existence of that same intent as a matter of law, when coupled with the myriad of disputed facts over the parties' relevant conduct related to the alleged agreement. The same holds true for the fact that the parties failed to file joint tax returns or establish a separate board of directors, bank account or name for the venture; when viewed in light of the accompanying disputed facts, this failure is not, in and of itself, absolute proof that they lacked the requisite intent to form a joint venture. *See Burde v. C.I.R.*, 352 F.2d 995, 1002 (2d Cir. 1966) (whether two parties entered into a joint venture agreement for tax purposes was not determined solely by lack of joint tax return but rather was a determination to be made by the trier of fact based on the parties' overall conduct). Abeles has alleged that the parties, in addition to expressing their intention to form the venture to one another, formulated pricing and marketing strategies together and held themselves out as a partnership to third parties. A reasonable jury could conclude that this alleged conduct demonstrated the requisite intent to enter a joint venture agreement, despite the fact that Richard Abeles did not label the agreement a "joint venture" to his employees and the parties did not establish a separate corporate vehicle for it. Therefore, the question of intent is best left to the trier of fact. *See Cosy Goose Hellas v. Cosy Goose USA, Ltd.*, 581 F. Supp. 2d 606, 618 (S.D.N.Y. 2008) ("A joint venture has been described 'as a nebulous concept whose boundaries are not precisely drawn. Defining a joint venture is easier than identifying it, for each case depends upon its own facts.'") (quoting *Backus Plywood Corp. v. Commercial Decal*, 208 F. Supp. 687, 690 (S.D.N.Y. 1962)); *Laurelle Mfg. Corp. v. Yours Truly, Inc.*, No. 85 Civ. 9080 (CSH), 1991 WL 18144 (S.D.N.Y. Feb. 5, 1991) (record in cross-motions for summary judgment on joint venture claim was replete with factual disputes regarding the intent of the parties and therefore summary judgment was not warranted on the

claim). Accordingly, the Court declines to rule as a matter of law that the undisputed facts demonstrate that the parties lacked the requisite intent to form a joint venture.

### ii. Sharing of Profits and Losses

"An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (citing *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (N.Y. 1958)). However, a joint venture does not require precisely equal sharing of profits and losses. *Richbell*, 765 N.Y.S.2d at 584 ("[W]e reject defendants' contention that a joint venture requires an equal sharing."); *see also Dundes v. Fuersich*, 791 N.Y.S.2d 893, 895 (N.Y. Sup. Ct. 2004) (citing *Richbell*, 765 N.Y.S.2d at 584). The Second Circuit, applying New York law, has determined that the loss of anticipated profits from a collaborative business endeavor alone does not constitute a shared loss under a joint venture agreement. *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983); *DeVito v. Pokoik*, 540 N.Y.S.2d 858 (N.Y. App. Div. 1989). Moreover, if a party only stands to lose the individual services it invested in that business endeavor, it is not incurring a shared loss as required by a joint venture agreement. *Dinaco, Inc.*, 346 F.3d at 68; *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 175; *B. Lewis Prod. v. Angelou*, No. 01 Civ. 530 (MBM), 2003 WL 21709465, at *12 (S.D.N.Y. July 23, 2003), *aff'd in part*, 99 Fed. Appx. 294 (2d Cir. 2004); *see also ARTCO, Inc.*, 1993 WL 962596, at *10 (noting that if "simply expending efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied . . . ."); *Steinbeck*, 4 N.Y.2d

at 317-18 ("[I]t is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders' agreement would give rise to a joint venture."). This Court has ruled in this same action that by claiming first, that the parties set the prices at which Creekstone would sell its product to Abeles and Abeles would sell that product to third parties and second, that they conferred about rebates and discounts to issue, Abeles sufficiently alleged that the parties shared profits and losses. *See Milton Abeles, Inc.*, 2007 WL 1434990, at *4-*5.

Creekstone argues that Abeles' joint venture claim fails as a matter of law because there was no provision for the sharing of profits and losses between the parties. In support of this argument, Creekstone offers the following undisputed facts: (1) Richard Abeles had no knowledge of the net profits enjoyed by either party to the alleged contract; (2) he admitted that "generally speaking," Creekstone's inventory drove the prices at which it sold its product to Abeles; and (3) he did not review those prices with a Creekstone representative in fine detail. However, a host of disputed evidence remains regarding whether the parties conferred to set the prices at which Creekstone sold it product to Abeles and Abeles sold that product to third parties, and jointly issued certain rebates and discounts to those third parties. For instance, Abeles cites to deposition testimony of Richard Abeles suggesting that the parties conferred about prices Creekstone would charge to Abeles and Abeles would charge to third party customers, (Pl.'s 56.1 ¶ 58), and Creekstone argues that the same deposition testimony undermines that claim. (Def.'s 56.1 ¶ 58.)

Abeles argues that Richard Abeles testified at length about losses Abeles incurred by offering a reduced price on Creekstone beef to garner new customers, as well as various promotional efforts undertaken by both parties, (Pl.'s 56.1 ¶ 70), while Creekstone argues that he failed to pinpoint any specific rebates, coupons or discounts offered. (Def.'s 56.1 ¶ 70.) As with the issue of intent, the numerous disputed facts preclude a determination by this Court that the parties did or did not adequately share profits and losses so as to meet the legal requirements of a joint venture.

### iii. Enforceability of the Joint Venture

Defendant argues that, even if the parties demonstrated the requisite intent to form a joint venture and adequately shared profit and losses, the terms of the alleged agreement are so indefinite as to render it unenforceable.

The Second Circuit, applying New York law, has stated that "in order for an agreement to be enforced, it must be sufficiently 'definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty.'" *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir. 1987) (quoting *Candid Productions, Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)). As a general rule, "a court should find an agreement too indefinite only as a 'last resort' when it is 'satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear.'" *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993) (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (N.Y. 1989), *cert. denied*, 498 U.S. 816 (1990)). However, "if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement

had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Candid Productions*, 530 F. Supp. at 1333-34 (citations omitted); *see also Interocean Shipping Co. v. National Shipping and Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972). *But see B. Lewis Productions, Inc. v. Maya Angelou, Hallmark Cards, Inc.*, No. 01 Civ. 0530 (MBM), 2005 WL 1138474, at *7-*10 (S.D.N.Y. May 12, 2005) (ruling that a contract against writer was enforceable where it lacked definite duration, quantity of works to be produced, time at which works were to be complete, and through which publishing medium the works would be exploited).

Creekstone submits that the alleged agreement lacked a set profit margin, geographic scope, duration, and parties and, therefore, is so indefinite that it is unenforceable. By way of evidence regarding profit margin, Creekstone notes that it is undisputed that Richard Abeles agreed that the aspirational profit margin of 10% could fluctuate, depending on the market. Further, Creekstone points out that throughout the course of this litigation, Richard Abeles has offered inconsistent testimony regarding the geographic scope and the parties involved in the agreement. As a threshold matter, the Court notes that alleged inconsistencies in a witness' testimony go to credibility, and any issues regarding Richard Abeles' credibility cannot be resolved by this Court. *See, e.g., Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the

finder of fact, not an exercise for the court on summary judgment."); *see also Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("[I]t is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997)); *see also Huff v. UARCO, Inc.*, 122 F.3d 374, 385-86 (7th Cir. 1997) ("We do not imply that plaintiffs have a strong case but rather only that they have enough of a case to go to a jury."). Even taking into account that Richard Abeles testified that the Company's aspirational profit margin could fluctuate, viewing the remainder of the disputed facts in the light most favorable to Abeles, the non-moving party, a reasonable jury could conclude that the terms of the agreement were sufficiently clear and, thus, enforceable.

In sum, because there remain disputed issues of material fact regarding the existence of a joint venture agreement between the parties and the ensuing alleged breach of that agreement, defendant's motion for summary judgment dismissing this claim is denied.

b. Breach of Fiduciary Duty

Defendant moves for summary judgment dismissing plaintiff's breach of fiduciary duty claim, arguing that as the parties did not enter into a joint venture agreement, the breach of fiduciary duty that flows from such a contract does not exist and cannot be breached.

It is well-settled that "[j]oint adventurers . . . owe to one another . . . the duty of the finest loyalty." *DIRECTV Group, Inc. v. Darlene Investments, LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, at *5 (S.D.N.Y. Sept. 27, 2006) (quoting *Meinhard v. Salmon*, 249 N.Y.

458, 463-64 (N.Y. 1928)); *see, e.g., Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2006); *Gramercy Equities Corp. v. Dumont*, 72 N.Y.2d 560, 566 (N.Y. 1988). Such a relationship "gives rise to a fiduciary duty on [the defendant fiduciary's] part to preserve and protect plaintiff's interest." *Gross v. Vogel*, 437 N.Y.S.2d 431, 433 (N.Y. App. Div. 1981); *see Shore Parkway Assoc.*, 1993 WL 361646, at *4 (finding that the complaint properly stated a claim for breach of fiduciary duty based on the plaintiff's claim that the defendant breached a joint venture agreement); *Ebker v. Tan Jay Int'l, Ltd.*, 741 F. Supp. 448, 468 (S.D.N.Y. 1990); *see also Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (N.Y. 1989) ("This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.") (citation omitted).

Abeles argues that a joint venture existed between the parties which precluded defendant from selling its product to Wild By Nature through a distributor other than plaintiff and, thus, defendant has breached its fiduciary duty to plaintiff by breaching the terms of the alleged agreement. Creekstone argues that, if such an agreement did exist, it precluded Abeles from selling beef products other than those sold by Creekstone in the market it allegedly created for Creekstone products and so breached the fiduciary duty flowing from that agreement. As stated *supra*, there are disputed issues of material fact between the parties over whether such an agreement existed, and if it did, what terms were contained therein. Therefore, the Court cannot rule as a matter of law that defendant did not breach a fiduciary duty owed to the plaintiff. Accordingly, defendant's motion

for summary judgment on plaintiff's breach of fiduciary duty claim is denied.

### c. Breach of Contract

#### i. Statute of Frauds Defense

Defendant further moves for summary judgment on plaintiff's claim that, even if a joint venture agreement did not exist between the parties, they were bound by an oral exclusive distributorship contract which defendant breached. Specifically, defendant argues that, even if the Court were to determine that an exclusive distributorship agreement existed with definite and enforceable terms, such a contract would violate the Statute of Frauds, which states that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." N.Y. U.C.C. § 2-201(1). Defendant submits that, because the contract at issue involved the purchase of more than $500 of goods and no writing memorializes the alleged agreement between the parties, plaintiff's breach of contract claim must fail as a matter of law.

As stated above, the U.C.C. Statute applies to any contract for the sale of goods exceeding $500, and requires that such an agreement be in writing. N.Y. U.C.C. § 2-201(1); *see, e.g., Rosenfeld v. Basquiat*, 78 F.3d 84, 93 (2d Cir. 1996); *Huntington Dental & Med. Co., Inc. v. Minn. Mining and Mfg. Co.*, No. 95 Civ. 10959 (JFK), 1998 WL 60954, at *4 (S.D.N.Y. Feb. 13, 1998); *United Beer Distrib. Co. v. Hiram Walker, Inc.*, 557 N.Y.S.2d 336, 337 (N.Y. App. Div. 1990) ("[Section 2-201(1)] has been held to apply to distributorship agreements which

necessarily involve the purchase of more than $500 of goods."). However, the parties dispute whether the alleged exclusive distributorship contract was, in fact, for the sale of goods; defendant submits that the alleged contract was for the purchase and sale of beef products, and plaintiff argues that it was for the exploitation of its contacts and good will in areas of its influence. "In deciding whether a contract is for the sale of goods, and thus plainly covered by the UCC, courts look to the main objective of the contract." *GE v. VARIG S.A.*, No. 01 Civ. 11600 (RJH) (JCF), 2004 U.S. Dist. LEXIS 1842, at *10 (S.D.N.Y. Feb. 6, 2004) (citation omitted); *see Consol. Edison Co. of New York, Inc. v. Westinghouse Elec. Corp.*, 567 F. Supp. 358, 361 (S.D.N.Y. 1983) ("In deciding whether a contract is one for the sale of goods or for the rendition of services, New York courts look to 'the main objective sought to be accomplished by the contracting parties.'") (quoting *Ben Construction Corp. v. Ventre*, 257 N.Y.S.2d 988, 989 (N.Y. App. Div. 1965)). Because the parties dispute whether the main objective of the contract was the sale of goods, and there are disputed facts dispositive of that inquiry, the Court is unable to rule as a matter of law that U.C.C. § 2-201(1) bars its enforcement.

#### ii. General Obligation Law § 5-701

Defendant also submits that even if the alleged contract, as plaintiff defines it, does not run afoul of the U.C.C., it could violate Gen. Oblig. Law § 5-701, which voids any agreement that by its terms cannot be performed in a year if that agreement is not in writing. The Second Circuit has stated that:

> This provision of the Statute
> of Frauds encompasses "only

those contracts which, by their terms, 'have absolutely no possibility in fact and law of full performance within one year.'" *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998) (quoting *D & N Boening v. Kirsch Beverages*, 472 N.E.2d 992, 993 (N.Y. 1984)) . . . . Thus, "full performance by all parties must be possible within a year to satisfy the Statute of Frauds." *Id*. [at 59.] If an agreement may be fairly and reasonably interpreted to permit performance within a year, the Statute of Frauds will not bar a breach of contract action no matter how improbable it may be that performance will actually occur within that time frame. *Id*. at 58 (collecting cases).

*Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). Further, under New York law, contracts of indefinite duration that do not include an express term indicating that they are terminable within a year are sometimes deemed to be incapable of being performed within a year and, thus, fall within the ambit of Section 5-701. *See Burke v. Bevona*, 866 F.2d 532, 539 (2d Cir. 1989) ("[A] termination provision must be express . . . in order to excuse a contract from the writing requirement of the [Section 5-701] Statute of Frauds.") (quotations and citation omitted); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 457 (N.Y. 1984) (finding, at the motion to dismiss stage, that, "[c]learly, termination of an agreement as a result of its breach is not performance thereof within the meaning of the Statute of Frauds, and an oral agreement which by its own terms must continue for more than a year unless terminated by its breach is void").

However, New York law also provides for several exceptions to this rule. As set forth by the New York Court of Appeals in *D & N Boening* – a case cited with approval by the Second Circuit in *Guilbert* – even a contract of indefinite duration may not be barred by Section 5-701 if, for example, it is "an agreement where, at any time, one or both parties could discontinue their activities or reject any or all particular transactions, . . . or determine for any just or sufficient reason that termination was necessary for the good of the business." *D & N Boening, Inc.*, 63 N.Y.2d 449 at 457-58 (citations omitted); *see North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 176-77 (N.Y. 1968) ("[I]t is clear that the agreement asserted by the plaintiff does not fall within the ban of [Section 5-701]. Although the parties may have expected the [alleged exclusive distribution] agreement to last over a long period, they contemplated its possible termination by action-unquestionably within the defendant's power to take at any time – discontinuing its [ ] sales in the New York area. That being so, the agreement did not, by its terms, of necessity extend beyond one year from the time of its making.") (internal quotation marks and citation omitted); *see also Weisse v. Engelhard Minerals & Chem. Corp.*, 571 F.2d 117, 119 (2d Cir. 1978) ("The practice of the New York courts has been to construe this one-year provision of the statute narrowly to give effect to oral contracts which are capable of being performed within one year. Thus, the one-year provision has been held to bar enforcement of oral contracts only in those cases where the contract is 'by express stipulation not to be performed within a year' and not to cases 'in which the performance of the agreement depends upon a contingency which may or may not happen within the year.'") (quoting *North Shore*, 239 N.E. 2d at

191); *Cosy Goose Hellas*, 581 F. Supp. 2d at 618 ("The statute of frauds will thus only apply when the agreement's terms specify that the agreement will last longer than one year; the fact that an agreement without a specified duration can last for more than one year does not subject the agreement to the written document requirement of N.Y. Gen. Oblig. Law §5-701(a)(1)."); *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 644-45 (E.D.N.Y. 2003) (stating that an oral joint venture agreement without a stated duration can be terminated at will); *Rail Eur. v. Rail Pass Express*, No. 94 Civ. 1506 (PKL), 1996 U.S. Dist. LEXIS 4183, at *12 (S.D.N.Y. April 3, 1996) ("Since the agreement could be terminated by either party in less than a year, it falls outside of the Statute of Frauds.") (citations omitted).

Here, plaintiff submits that the exclusive distributorship contract was renewed annually by the parties, making performance possible in each instance in under a year. (R. Abeles Dep. at 222-23.) Plaintiff further asserts that, even if the contract was not so renewed, it could have been terminated on reasonable notice of nine months, meaning it could be performed within the requisite term. (Pl.'s Opp., at 21.) Again, the disputed facts that bear on this issue preclude summary judgment in defendant's favor on plaintiff's breach of contract claim.

### iii. Damages

Finally, Creekstone argues that, even if a valid and enforceable contract governed the conduct between the parties, Abeles' claims must fail as a matter of law because Abeles has not produced evidence that it suffered damages, and even if it did, it has not demonstrated that it suffered those damages as a result of Creekstone's conduct. Specifically, Creekstone asserts that Abeles' expert report, which purports to quantify alleged damages, is speculative at best and thus should be disregarded, and even if the Court accepts this explication of damages, they remain "premised on the theory that Abeles should have been able to continue buying beef from Creekstone and selling it to third parties after May 27, 2006," (Defendant's Memorandum of Law ("Def.'s Memorandum"), at 8), and because Abeles concedes that it affirmatively stopped ordering Creekstone beef (versus Creekstone refusing to sell beef to Abeles), Abeles is not entitled to damages for the cessation of sales which it brought about. Creekstone further submits that all of Abeles' claims should be dismissed because even though Creekstone did not refuse to sell beef to Abeles, it would have been entitled to do so because Abeles failed to pay for the beef that it purchased, as discussed *infra*.

To establish a breach of contract claim under New York law, a plaintiff must prove: "(1) a contract existed; (2) it adequately performed under the contract; (3) the defendant breached the contract; and (4) damages attributable to the breach." *Edward Andrews Group, Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731 (LTS) (AJP), 2005 U.S. Dist. LEXIS 30125, at *12 (S.D.N.Y. Nov. 29, 2005) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). Creekstone argues that plaintiff's proof of damages relies upon an expert report that the Court should disregard; therefore, the Court must first determine the admissibility of the report in question.

### a. Expert Testimony

Abeles asserts that defendant's breach of the alleged joint venture and/or exclusive distributorship agreement between the parties caused damages by way of lost profits from sales of Creekstone beef. As part of its proof, Abeles offers the expert report of Allan Marrus. Mr. Marrus calculated Abeles' alleged damages on the assumption that nine months represented the "minimum amount of reasonable notice" necessary if one of the parties was to terminate the agreement. (Def.'s 56.1 ¶ 104.) Defendant argues that the expert report of Marrus should be disregarded pursuant to *Daubert v. Merrell Down Pharmaceutical, Inc.*, 509 U.S. 579 (1993), because Marrus had no understanding of the terms of the alleged contract but rather based his analysis on figures provided to him by Richard Abeles without confirming or analyzing that data; therefore, his report is "speculative at best." Abeles, in turn, asserts that Marrus determined the dollar value of damages based upon the dollar volume of the business conducted by the parties by performing simple arithmetic calculations that did not require complex knowledge to which the rigors of the *Daubert* test would apply. As set forth below, the Court finds that the Marrus opinion report is admissible under *Daubert* and sufficient, in conjunction with the remaining evidence submitted by both parties, to create genuine issues of material fact regarding whether any damages did in fact flow from Creekstone's alleged abrogation of the alleged contract.

In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence. *Accord Nora Bevs., Inc., v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998) (stating that on summary judgment motion, "[a] district court properly considers only evidence that would be admissible at trial"); *Tamarin v. Adam Caterers*, 13 F.3d 51, 53 (2d Cir. 1993). Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

> Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citations and footnotes omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Id*. at 66. Thus, if the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence.

*Id.* at 66-67. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See G.E. v. Joiner*, 522 U.S. 136, 142-43 (1997). Accordingly, the Court must examine the admissibility of plaintiff's expert testimony in ruling on defendant's motion for summary judgment.

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). Because defendant has challenged the admissibility of the Marrus report only under the second prong of the *Nimely* inquiry, the Court will proceed to the question of whether that report adequately depends upon "reliable data and methodology."

With respect to reliability, "'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2d Cir. 2002) (internal quotation marks omitted)). Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert*, 509 U.S. at 593 n.10 ("These matters should be established by a preponderance of proof.")

(citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); *see also* Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

Defendant attacks the admissibility of the Marrus report under the second prong of the *Nimely* inquiry, arguing that his opinion is not based upon "reliable data and methodology" because it rests upon facts provided by Richard Abeles regarding the length of the alleged contract and Abeles' ability to mitigate its damages without independent confirmation of those assertions. The Court notes that Marrus' ability to testify relies upon the underlying factual bases of his report being proven at trial. Presuming plaintiff is able to prove the facts alleged, Creekstone's objections to the Marrus report go to weight rather than admissibility. *See Aventis Envtl. Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) ("Defendants are free to challenge the basis and source for [the proposed expert's] numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony.") (citing *Concise Oil & Gas P'ship v. Louisiana Interstate Gas Corp.*, 986 F.2d 1463, 1476 (5th Cir. 1993)); *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, No. 99 Civ. 8598 (JCF), 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002); *see also Amerisource Corp. v. RX USA Intern, Inc.*, No. 02 Civ. 2514 (JMA), 2008 WL 2783355, at *2 (E.D.N.Y. July 15, 2008). Defendant has highlighted potential flaws in the Marrus' report methodology, but given that there is sufficient indicia of reliability to allow admission of his testimony, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citations and quotations omitted); *accord Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable"); *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (D. Vt. 1995) (district court did not abuse its discretion in admitting expert testimony where "[d]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, [went] to the weight, not the admissibility, of his testimony"). *But see Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."). Accordingly, the Court declines to rule at this juncture that the Marrus report is so unreliable as to deem it inadmissible. Therefore, its accounting of alleged damages creates a fact issue regarding whether Abeles has adequately demonstrated damages, precluding summary judgment at this juncture.

b. Damages Causation

Creekstone finally argues that, assuming that Abeles did in fact incur damages, it is still not entitled to relief on a breach of contract claim because those damages were attributable to Abeles' decision to stop ordering Creekstone beef rather than any conduct on Creekstone's part. As stated *supra*, to prevail on a breach of contract claim, a party must demonstrate that the damages incurred were "attributable to the breach." *Edward Andrews Group, Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731 (LTS) (AJP), 2005 U.S. Dist. LEXIS 30125,

at *12 (S.D.N.Y. Nov. 30, 2005) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). If the lost profits alleged by Abeles were a product not of a breach of contract by Creekstone but the Company's own conduct, Abeles would not be entitled to recovery on this claim. However, Abeles has asserted that it ceased ordering Creekstone products when Creekstone breached the alleged joint venture and/or exclusive distributorship agreement between the parties and, therefore, all damages suffered are directly attributable to that breach. Because the record is rife with disputed issues of material fact on this issue, the Court cannot conclude as a matter of law that Abeles is not entitled to damages and, thus, Creekstone's motion for summary judgment on all claims asserted by Abeles on such grounds must be denied.

### d. Quasi-Contract Claim

Finally, defendant seeks summary judgment on plaintiff's quasi-contract claim, pled in plaintiff's second amended complaint as separate claims of unjust enrichment and *quantum meruit*.[5] Plaintiff may only assert this claim in the absence of an agreement between the parties, be it oral, written or implied-in-fact.[6] *See, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448

F.3d 573, 586 (2d Cir. 2006) (citing *Goldman v. Metro Life Ins. Co.*, 807 N.Y.S.2d 583 (N.Y. 2005)). "In order to recover in *quantum meruit* under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (citation and internal quotation marks omitted)); *see also Beth Israel*, 448 F.3d at 586.

Defendant argues that summary judgment is warranted in its favor as to plaintiff's quasi-contract claim on the following grounds: (1) plaintiff benefitted from any alleged effort it put forth to market defendant's product; (2) valid and enforceable contracts – namely, the invoices for beef products sold – exist, thus barring the instant claim; and (3) plaintiff had no reasonable expectation of compensation from defendant for its alleged services because the relationship between the parties was based on the understanding that profits would come from the payments plaintiff received from its third party customers. For thre reasons set forth below, viewing the evidence in the light most favorable to plaintiff, the non-moving party, the Court concludes that disputed issues of material fact preclude summary judgment in defendant's favor on this claim.

First, defendant asserts that plaintiff is not entitled to quasi-contractual relief because any efforts expended to promote and sell Creekstone products were done so for the benefit of Abeles, not Creekstone, as evidenced by the 10% gross profit plaintiff

---

[5] The Court determined in ruling on defendant's motion to dismiss in this action that the two claims should be analyzed as a single *quasi-contract* claim. *See Milton Abeles, Inc.*, 2007 WL 1434990, at *11.

[6] Were the Court to rule as a matter of law that the parties were bound by either a joint venture or exclusive distributorship agreement, plaintiff's claim for quasi-contractual relief would be barred. However, because the Court is unable to make such a determination at this stage in the proceedings, it will presume that plaintiff may potentially raise this claim and review defendant's motion for summary judgment on it on the merits.

claims to have earned on sales of defendant's product.[7] Accordingly, any benefit enjoyed by Creekstone as a result of those efforts was purely incidental. In bringing a claim of unjust enrichment, "[i]t is the plaintiff's burden to demonstrate that services were performed for the defendant resulting in the latter's unjust enrichment, and the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment." *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888, at *17 (S.D.N.Y. Dec. 22, 2003) (quoting *Clark v. Daby*, 751 N.Y.S.2d 622, 623-24 (N.Y. App. Div. 2002)); *see Kagan v. K Tel Entertainment, Inc.*, 568 N.Y.S.2d 756, 757 (N.Y. App. Div. 1991) ("[A]s reflected in the common law of the various states, to recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.") (internal citations omitted).[8] Thus, if the benefit enjoyed by the defendant is "purely incidental," the plaintiff has not carried his burden. *See Clark*, 751 N.Y.S.2d at 624. In making such a determination, courts "'will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent.'" *Id.* at 623-24 (quoting *Paramount Film Distrib.*

---

[7] In arguing so, defendant is presumably attacking the "unjust enrichment" aspect of plaintiff's quasi-contract claim, as it is well-settled both that "[u]njust enrichment is a quasi-contractual remedy," *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888, at *17 (S.D.N.Y. Dec. 22, 2003); *see Granite Partners, LP v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998), and "to prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *In re Mid-Island Hospital, Inc. v. Empire Blue Cross and Blue Shield*, 276 F.3d 123, 129 (2d Cir. 2002) (internal quotation and citation omitted).

[8] Defendant cites to *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157 (S.D.N.Y. 1998) as instructive on this issue; in that case, alleged exclusive distributor plaintiff Piccoli A/S brought a claim of unjust enrichment against defendant manufacturer Calvin Klein Jeanswear Co. on the grounds that Piccoli had created a market for Jeanswear's product pursuant to an agreement Piccoli made with Calvin Klein, Inc., the owner of the license under which Jeanswear manufactured the product, a market which Jeanswear later exploited by selling its product directly in that same market. *See generally id.* The court dismissed plaintiff's claim, ruling that in establishing the market for the Calvin Klein, Inc. clothing products, "plaintiff performed for its own benefit and perhaps the benefit of its customers and its contract partners . . . . Defendants' actions in tapping into the demand created by [the plaintiff] therefore cannot give rise to a claim for quasi-contractual relief." *Id.* at 166-67. Creekstone argues that the same result should apply here. However, the Court notes that even though defendant Jeanswear received a benefit from Piccoli's activities, Piccoli acted pursuant to a contract with licensor Calvin Klein, Inc., *i.e.*, "at the behest of someone other than the defendant," and therefore could not seek relief from the defendant. Here, Abeles alleges that in creating a market for Creekstone products, it was acting at the behest of Creekstone. Accordingly, the fact that Abeles received a benefit by way of profits from its alleged marketing efforts does not bar quasi-contractual recovery as a matter of law.

*Corp. v. State of New York*, 30 N.Y.S.2d 415, 421 (N.Y. 1972)); *see also TEG NY LLC v. Vardenwood Estates, Inc.*, No. 03 Civ. 1721 (DGT) (CLP), 2004 U.S. Dist. LEXIS 5046, at *23 (E.D.N.Y. Mar. 30, 2004). Here, Abeles alleges that it committed time and effort to creating a new market for Creekstone's product, which Creekstone later exploited to its own benefit. Creekstone argues that any benefit enjoyed was incidental to Abeles' efforts, which were undertaken for Abeles' benefit, as evidenced by the 10% profit it enjoyed. Though it is undisputed between the parties that Abeles did benefit from distributing Creekstone beef in that new market, there remain genuine issues of material fact regarding whether it undertook efforts to create that market at Creekstone's behest. Accordingly, the fact that Abeles benefitted from the actions it allegedly undertook on behalf of Creekstone does not definitively bar quasi-contractual relief as a matter of law, rendering summary judgment inappropriate. *See, e.g., The Haskell Co. v. Radiant Energy Corp.*, No. 05 Civ. 04403 (DLI) (MDG), 2007 WL 2746903, at *11 (E.D.N.Y. Sept. 19, 2007) (summary judgment inappropriate where plaintiff benefitted from its actions but factual disputes remained regarding whether defendant was also an intended beneficiary).

Creekstone next argues that Abeles is not entitled to quasi-contractual relief because the invoices for each shipment of beef delivered constituted valid and enforceable contracts governing the agreement between the parties. There remain, however, issues of disputed fact between the parties regarding whether the actual agreement was one for the sale of goods or the joint venture and/or exclusive distributorship contract alleged by Abeles. Therefore, the Court cannot rule as a matter of law that the invoices constitute valid and enforceable contracts barring any quasi-contractual relief.

Creekstone further asserts that Abeles' quasi-contractual claim fails because Abeles had no "expectation of compensation" from Creekstone, as evidenced by its admission that profits derived from the parties' agreement would flow from monetary payments it received from its customers rather than Creekstone. However, this argument presumes that "compensation" must necessarily be monetary in nature. *See Hallissey v. America Online, Inc.*, No. 99 Civ. 3785 (KTD), 2006 U.S. Dist. LEXIS 12964, at *17 (S.D.N.Y. Mar. 10, 2006) (benefits other than cash payments may constitute "compensation" when contemplating the "expectation of compensation" for services rendered). Abeles has alleged that it promoted Creekstone products in its sphere of influence with the expectation that it would act as the exclusive distributor of those products in the newly-created market. This disputed fact on the issue of expectation of compensation precludes dismissal of Abeles' quasi-contract claim on that basis.[9]

_____

[9] Defendant also argued at oral argument that plaintiff has failed to establish the reasonable value of its services, by only offering its estimation of potential profits lost when it stopped selling Creekstone beef. However, although defendant raised this argument in its motion to dismiss the complaint, it is not one of the grounds relied upon in its memorandum of law filed in support of its motion for summary judgment. Therefore, because defendant failed to raise this issue in its motion and plaintiff has not had an opportunity to respond to it in writing, the Court declines to address that issue at this time. *See Smith v. Cuomo*, No. 07-4791-cv, 2009 WL 59999, at *2 (2d Cir. Jan. 12, 2009) (summary order) ("We decline to consider arguments that [appellant] raises for the first time in the reply brief or at oral argument."). However, if defendant wishes, the Court will allow it to renew its motion on this particular claim to assert this additional ground and will give plaintiff a full

Accordingly, defendant's motion for summary judgment on the quasi-contract claim is denied.

### C. Creekstone's Motion for Summary Judgment Granting Its First and Fourth Counterclaims and Abeles' Cross-Motion for Summary Judgment Dismissing Those Claims

In addition to its motion for summary judgment dismissing the entirety of Abeles' claims, Creekstone further moves for summary judgment on its own counterclaims for: (1) goods sold and delivered; and (2) Abeles' alleged violation of the PSA. Abeles cross-moves for summary judgment on those same counterclaims.[10] For the reasons set forth below, both motions are denied.

opportunity to respond to it in writing.

[10] Abeles further moves that this Court strike defendant's expert report on the grounds that the opinions contained therein improperly rely upon material subject to a Protective Order issued in another civil action in which Abeles was a party. Specifically, Abeles asserts that defendant's expert, Sam Browne, reviewed documents which were provided to his firm four years ago in connection with unrelated pending litigation. (Plaintiff's Local Rule 56.1 Statement of Undisputed Facts in Support of Cross-Motion ("Pl.'s Cross 56.1") ¶ 27.) Defendant contends that those documents were produced by plaintiff in the instant action. (Defendant's Local Rule 56.1 Statement of Undisputed Facts in Opposition to Cross-Motion ¶ 27 ("Def.'s Cross 56.1"); Browne Decl. ¶¶ 5-6, Ex. A.) After reviewing the submissions by both parties relevant to this issue, the Court finds that Abeles has failed to show that Mr. Browne's review of the financial report at issue violated the Protective Order. Accordingly, the Court denies plaintiff's motion to strike defendant's expert report.

### 1. Goods Sold and Delivered

#### a. Facts Alleged by the Parties

Creekstone seeks summary judgment granting its claim for "goods sold and delivered," arguing that the undisputed facts demonstrate that Abeles violated the Uniform Commercial Code ("U.C.C.") when it refused to make payment for $703,765.00 worth of beef it ordered, received and accepted. Specifically, Creekstone states that on or about June of 2003, it began selling beef products to Abeles and continued to do so until approximately May of 2006. (Def.'s 56.1 ¶¶ 8, 11.) Creekstone submits that each time it shipped beef to Abeles, it included an invoice that described the purchased products, the price of each unit and the total price for the entire shipment. (*See, e.g.,* M. O'Donnell Decl., Ex. A.) Abeles admits that "it was a common practice for Creekstone to include invoices with its shipments . . . but cannot state with certainty that this was the case 'each time'" and further argues that "in many cases, Creekstone's price on the invoice was not the price quoted by Creekstone, nor the price Abeles agreed to pay." (Pl.'s 56.1 ¶ 9; R. Abeles Decl. ¶ 47; Pl.'s Opp., Ex. 10.)

It is undisputed between the parties that Creekstone invoices included a provision that payment was due within seven days and that Abeles often did not remit payment within that window of time. (Def.'s 56.1 ¶ 10.) However, Abeles contends that "Creekstone regularly accepted payments within 30 days as part of its normal terms," (Pl.'s 56.1 ¶ 10), and, therefore, it could not have been late in its payments because its payment schedule was "consistent with . . . the course of dealing between the parties over approximately *three years*, as evidenced by . . . Creekstone's continued shipment of product to Abeles." (*Id.* at ¶ 12.)

Creekstone submits that on April 28, 2006, it threatened to stop its shipments to Abeles and in response, Richard Abeles, President of the Company, represented that Abeles would make timely payments. (Def.'s 56.1 ¶ 17.) By May 21, 2006, Abeles' outstanding balance with Creekstone was $743,765.00, an amount which Richard Abeles confirmed via electronic mail that the company would pay. (*Id.* ¶¶ 18-19.) Abeles made two subsequent payments of $20,000.00 to Creekstone, leaving an outstanding balance of $703,765.00, which Richard Abeles confirmed the Company has not paid to date. (*Id.* ¶¶ 20-21.) On or around May 26, 2006, Abeles stopped ordering beef from Creekstone. (*Id.* ¶ 22.)

In its cross-motion for summary judgment seeking dismissal of this same claim, Abeles first argues that it was not late in its payments because the parties' course of conduct throughout their business dealings had provided for payments remitted later than the seven days specified on the invoices. (R. Abeles Dep. at 237, 251, 256-58.) Abeles further charges that any amount owed pursuant to invoices issued is off-set by the damages owed by Creekstone to Abeles for the breach of the alleged joint venture and/or exclusive distributorship agreement between the parties, discussed *supra*. (R. Abeles Decl. ¶ 64.) Finally, Abeles submits that the $20,000.00 payment referenced by Creekstone was made by Richard Abeles as a "good will gesture," not for any specific balance owed pursuant to the issued invoices, and that moreover, Creekstone shipped product that was "old and 'not in the right condition'" and inserted prices into the issued invoices to which Abeles had not consented in violation of the invoiced contract; therefore, Abeles was entitled to deduct the cost of damages arising from that breach from any alleged outstanding balance. (Pl.'s 56.1 ¶¶ 18-21.)

#### b. Legal Standard

Under the U.C.C., a seller is entitled to payment and a buyer is required to pay when the seller sells and delivers goods to the buyer, which the buyer then accepts. N.Y. U.C.C. § 2-607(1); *Conoco Phillips v. 261 Merrick Road Corp.*, 428 F. Supp. 2d 111, 126 (E.D.N.Y. 2006) (the essential elements of a goods sold and delivered claim are "'the purchase, sale and delivery of goods at an established price and nonpayment therefor'") (quoting *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629 (NRB), 2004 WL 830079, at *2 (S.D.N.Y. Apr. 13, 2004)). However, a buyer may, after providing proper notice to the seller, "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the contract." N.Y. U.C.C. § 2-717; *Laish, Ltd. v. Jafora-Tabori, Ltd.*, No. 02 Civ. 1322 (SLT) (MDG), 2006 WL 270250, at *4 (E.D.N.Y. Feb. 1, 2006).

#### c. Application

Abeles argues that because the underlying contract controlling the purchase of Creekstone beef was the one that allegedly formed the joint venture and/or exclusive distributorship and not the specified invoices, the U.C.C. is inapplicable because it solely governs the "sale of goods." N.Y. U.C.C. § 2-201(1); *see, e.g., Rosenfeld v. Basquiat*, 78 F.3d 84, 93 (2d Cir. 1996). However, even assuming that such an agreement did not exist between the parties, Abeles' allegation that Creekstone shipped substandard beef at non-negotiated prices would also provide a valid defense to Creekstone's claim, because such an action on Creekstone's part would constitute a breach of each specific contract – namely, the invoices – by which Creekstone shipped beef to Abeles. Abeles represents, without specifying when, that

Creekstone shipped a "substandard product" and inserted prices on invoices to which Abeles had not consented and therefore, it is entitled to deduct from the outstanding balance the cost of damages arising from Creekstone's breach of each applicable invoice. (Pl.'s 56.1 ¶ 18.) Creekstone disputes this factual assertion. (Def.'s Reply, at 2.) Creekstone further argues that Abeles "sets forth no evidence . . . that the alleged 'substandard' beef is related to the $703,765 owed." (*Id.*) However, viewing the facts alleged in the light most favorable to the non-moving party, and drawing every positive inference therefrom, the Court cannot conclude that there is no genuine issue of material fact regarding whether Creekstone breached the contracts established by each individual invoice by shipping an inferior product for non-negotiated prices. A reasonable jury could conclude, based on the evidence presented by both parties, that Creekstone breached the contract established by each individual invoice and, therefore, is not entitled to judgment on a "goods sold and delivered" claim. Accordingly, defendant's motion for a grant of summary judgment on this claim and plaintiff's cross-motion for its dismissal both must fail.

### 2. Violation of Packers and Stockyards Act

Creekstone next moves for summary judgment on its claim that by refusing to pay the alleged $703,765.00 balance owed, Abeles has violated the PSA, which Creekstone submits prohibits a packer's refusal to pay a supplier of meat as a deceptive practice. 7 U.S.C. § 192. Specifically, Creekstone argues that because it is undisputed that Abeles is a "distributor and processor of meat products and poultry products" and Creekstone is a supplier of beef, (Def.'s 56.1 ¶ 2), the Court may determine as a matter of law that Abeles' failure to pay an alleged balance owed violated the PSA. In its cross-motion seeking summary judgment dismissing the same claim, Abeles argues that the remedy Creekstone seeks under the PSA is

limited by the provisions of 7 U.S.C. § 228b to a sale or other transaction in "livestock." Because Abeles represents that livestock were not involved in the transactions at issue between the parties, any remedy under the PSA is unavailable to Creekstone as a matter of law.[11] Abeles further argues that even if Creekstone's desired relief is not limited by the provisions of § 228b, the PSA requires that it plead that Abeles' allegedly unlawful behavior adversely affected competition, which it has not done. Finally, Abeles maintains that should the Court determine that the PSA does apply to the transaction between the parties, it has not committed a deceptive practice under the Act because any delayed payments to Creekstone were part of a "course of dealing" permitted under the Act. Creekstone, in response, argues that it seeks judgment and damages pursuant to 7 U.S.C. § 192, which is not limited to transactions in livestock and that no "course of dealing" was established that would allow Abeles to refuse payment on the alleged balance owed.

The Court determines that, as a matter of law, the provision of the PSA pled by Creekstone applies to the transaction between the parties and is not limited to those in livestock. Moreover, this provision does not require Creekstone to plead that Abeles' alleged deceptive practice adversely affected competition. However, because there are genuine issues of material fact regarding whether Creekstone's allegedly late payments were part of a "course of dealing" and whether its current outstanding

---

[11] The parties dispute whether the relevant transaction involved "livestock" as it is defined by the PSA, (*see* Pl.'s Cross 56.1 ¶¶ 6-12; Def.'s Cross 56.1 ¶¶ 6-12), but this dispute is immaterial at this juncture because other issues of material fact preclude summary judgment on this claim for the reasons stated *infra*.

balance is offset by damages flowing from the allegedly breached joint venture and/or exclusive distributorship agreement, Creekstone's motion for summary judgment granting this claim and Abeles' cross-motion for dismissal of the same claim are both denied.

### a. Legal Standard

The PSA was enacted in 1921 "to comprehensively regulate packers, stockyards, marketing agents and dealers." *Hays Livestock Comm'n Co. v. Maly Livestock Comm'n Co.*, 498 F.2d 925, 927 (10th Cir. 1974). At that time, "[t]he chief evil feared [was] the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922); *see also United States v. Perdue Farms, Inc.*, 680 F.2d 277, 280 (2d Cir. 1982) ("As originally enacted in 1921, the purpose of the Packers and Stockyards Act was to combat anticompetitive and unfair practices in the highly concentrated meatpacking industry."). "Section 202 of the original Act made it unlawful for any 'packer' to engage in any anticompetitive, monopolistic, discriminatory, or deceptive practices." *See id.* at 281. A "packer" is defined by 7 U.S.C. § 191(b) as "any person engaged in the business . . . of manufacturing or preparing meats or meat food products for sale or shipment in commerce." *See also Trunz Pork Stores v. Wallace*, 70 F.2d 688, 689 (2d Cir. 1934) ("A packer is one who engages in commerce in meats."); *but see Jackson v. Eckrich*, 53 F.3d 1452, 1457 (8th Cir. 1995) ("a 'packer' is defined as a person engaged in the livestock business."). Section 202 of the PSA states that "it shall be unlawful for any packer . . . with respect to livestock, meats, meat food products, or livestock products in unmanufactured form . . . to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device." 7 U.S.C. § 192(a). This provision of the statute does not specify what actions would constitute such a practice or device, *see London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1302 (11th Cir. 2005), but the Department of Agriculture, the agency entrusted with issuing regulations pursuant to the PSA, has determined that the failure to pay a supplier of meat would constitute an "unfair . . . or deceptive practice or device." *See, e.g., Liberty Mutual Ins. Co. v. Bankers Trust Co.*, 758 F. Supp. 890, 896 n.7 (S.D.N.Y. 1991); *In re FLA Packing & Provision, Inc., and C. Elliot Kane*, P&S Docket No. D-95-0062, 1997 WL 809036, at *6 n.1 (U.S.D.A. Sept. 24, 1997) ("Failure to pay for meat and the issuance of NSF checks in payment for meat by a packer have also been held to be unfair practices in violation of section 202(a) of the Act (7 U.S.C. § 192(a.)"); *In re: Central Packing Co., Inc. d/b/a Plat-Central Food Services Co., Inc., a/k/a Plat - Central Food Service Supply Co., and Albert Brust, an individual*, 48 Agric. Dec. 290, 297-99 (corporate respondent violated Section 202(a) when it failed to pay for "meat and meat products") (U.S.D.A. Feb. 14, 1989); *In re Rotches Pork Packers*, 46 Agric. Dec. 573, 578-80 (U.S.D.A. Apr. 13, 1987).

"Any delay in payment or attempt to delay" payment is also an unfair practice under 7 U.S.C. § 228b, which applies to a "packer purchasing livestock." Thus, a party seeking to recover payment *under this specific provision* of the PSA must necessarily demonstrate that the transaction at issue involved livestock. *Premier Pork L.L.C. v. Westin, Inc.*, No. 07 Civ. 1661, 2008 U.S. Dist. LEXIS 20532, at *29-*30 (D.N.J. Mar. 17, 2008) (". . . plaintiff confirms that [its PSA deceptive practice] claim is premised on [7 U.S.C. § 228b] . . . . However, the quoted statutory text clearly indicates that [this provision] applies only to transactions involving the sale of livestock.")

(internal citation omitted); *see also In re FLA Packing & Provision, Inc.*, 1997 WL 809036, at *4 ("The corporate Respondent has repeatedly purchased and failed to pay for livestock and meat . . . . These are unfair practices that violate section 202(a) of the Act, 7 U.S.C. 192(a), *and with respect to the livestock purchases* also violate section 409 of the Act, 7 U.S.C. 228b.") (emphasis added). Therefore, though both 7 U.S.C. §§ 192(a) and 228(b) provide relief for a party's failure to pay for products purchased, the latter requires that the transaction at issue involve livestock while the former does not.

Many courts, however, have determined that "only those unfair, discriminatory or deceptive practices adversely affecting competition are prohibited by the PSA." *London*, 410 F.3d at 1303; *see Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1280 (11th Cir. 2005); *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1324 n.6 (11th Cir. 2005); *I.B.P., Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999); *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995); *Farrow v. Dep't of Agric.*, 760 F.2d 211, 214 (8th Cir. 1985); *De Jong Packing Co. v. U.S. Dep't Agric.*, 618 F.2d 1329, 1336-37 (9th Cir. 1980); *Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 369-70 (7th Cir. 1976); *Armour & Co. v. United States*, 402 F.2d 712, 722-23 (7th Cir. 1968); *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 827 (E.D. Va. 2002); *Philson v. Cold Creek Farms*, 947 F. Supp. 197, 200 (E.D.N.C. 1996). *But see Spencer Livestock Comm'n Co. v. Dep't of Agric.*, 841 F.2d 1451, 1454-55 (9th Cir. 1988). To broaden the scope of the PSA such that a litigant need not demonstrate a competitive impact "would subject dealers to liability under the PSA for simple breach of contract . . . ." *London*, 410 F.3d at 1304.

There is, however, a circuit split, as the United States Court of Appeals for the Fifth Circuit recently ruled that "a plaintiff need not prove an adverse effect on competition to prevail under 7 U.S.C. Sections 192(a-b)." *Wheeler v. Pilgrim's Pride Co.*, 536 F.3d 455, 456 (5th Cir. 2008). The Court noted that Sections 192(a-b) do not "contain[] language limiting its application to only those acts or devices, which have an adverse effect on competition, such as 'restraining commerce.' Under well-settled principles, we must refrain from reading additional terms, such as those that would require an adverse effect on competition, into these sections." *Id.* at 459. The Court further observed that Sections 192(c-e) do reference acts which "restrain commerce" or "create a monopoly" and if Congress had intended to similarly limit the scope of 192(a-b) to those acts which adversely affect competition, it could have included that same language therein, but did not. Therefore, the Court declined to "adopt a reading of the PSA that engrafts an adverse effect on competition requirement onto Sections 192(a-b)." *Id.* at 460; *see also Schumacher v. Tyson Fresh Meats, Inc.*, 434 F. Supp. 2d 748, 750-55 (D.S.D. 2006) (noting that § 192(a) addresses practices that adversely affect competition, but rejecting the conclusion that the statutory provision only applies to those types of practices); *Kinkaid v. John Morrell & Co.*, 321 F. Supp. 2d 1090, 1103 (N.D. Iowa 2004) (citing *Wilson & Co. v. Benson*, 286 F.2d 891, 895 (7th Cir. 1961) ("[T]his court finds that only a strained reading of the statute could require that practices that are 'unfair' or 'deceptive' within the meaning of § 192(a) must also be 'monopolistic' or 'anticompetitive' to be prohibited.")).

The Court finds this reasoning persuasive and adopts this interpretation of the relevant statute. Accordingly, a party seeking relief under 7 U.S.C. § 192(a) is not required to demonstrate that a failure to pay for meat or meat products only constitutes a deceptive or

unfair product under the Act if it also adversely affects competition.

### b. Application

Here, Creekstone argues that because Abeles is a "packer" as defined by 7 U.S.C. § 191, its failure to pay the full balance of $703,765.00 in a timely manner constitutes a deceptive or unfair practice and thus violates 7 U.S.C. § 192(a). Creekstone seeks summary judgment granting relief under that same provision. Abeles cross-moves for an order dismissing the claim on the grounds that it fails as a matter of law both because that provision only applies to transactions in livestock and because it requires Creekstone to plead that the alleged conduct adversely affected competition. The Court rejects this argument and determines that the provision of the PSA under which Creekstone seeks relief is not limited to transactions in livestock and does not require a showing of adverse effect on competition. However, as stated above, genuine issues of material fact remain regarding whether Abeles' allegedly late payments were actually part of a larger "course of dealing" between the two parties and whether it was entitled to withhold payment as an offset from damages incurred from an alleged breach of the joint venture and/or exclusive distributorship agreement between the parties. Therefore, both Creekstone's motion and Abeles' cross-motion on this claim are denied.

### III. Conclusion

For the foregoing reasons, the Court denies the motions for summary judgment by Abeles and Creekstone in their entirety.[12] Further, the Court denies plaintiff's motion that defendant's expert report be stricken from the record.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated:    March 30, 2009
          Central Islip, New York

* * *

The attorney for plaintiff is Steven L. Levitt, Esq., Steven L. Levitt & Associates, P.C., Two Hillside Avenue, Building F, Williston Park, New York 11596. The attorney for defendant is Matthew Solum, Esq., Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022.

---

[12] Because defendant's motion for an award of prejudgment interest necessarily depends on the Court granting summary judgment on either its goods sold and delivered claim or PSA claim, the Court need not consider it at this stage in the proceedings. The same holds true for defendant's motion for an award of attorney's fees.