UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

Nº 06-CV-3893 (JFB) (AKT)

———————

MILTON ABELES, INC.,

Plaintiff,

VERSUS

CREEKSTONE FARMS PREMIUM BEEF, LLC,

Defendant.

———————

MEMORANDUM AND ORDER
February 1, 2010

———————

JOSEPH F. BIANCO, District Judge:

Plaintiff Milton Abeles, Inc. (hereinafter "Milton Abeles" or "plaintiff") brings this action in diversity[1] against Creekstone Farms Premium Beef, LLC (hereinafter "Creekstone" or "defendant"), asserting claims related to Creekstone's alleged breach of an agreement with Milton Abeles. Specifically, plaintiff asserts the following claims against defendant under New York law:[2] (1) breach of a joint venture agreement; (2) breach of contract; (3) breach of fiduciary duty; and (4) quasi-contract.[3] Plaintiff seeks a sum to be

---

[1] Milton Abeles is a New York corporation with its principal place of business located in Port Washington, New York. (PTO, Stip. Facts ¶¶ 1, 3.) Creekstone is a Delaware corporation with its sales and processing center located in Arkansas City, Kansas. (*Id.* ¶ 2.)

[2] In exercising its diversity jurisdiction, the Court must "apply the substantive law of the state to which the forum state, New York, would have turned had the suit been filed in state court." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 280 (2d Cir. 1981) (citations omitted). Because the plaintiff is from New York and the transactions at issue took place in New York, this Court properly applies New York law. *See Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n.4 (2d Cir. 1981).

[3] Plaintiff's original complaint also brought claims for breach of implied covenant of good faith and fair dealing and unfair competition, but those claims were dismissed by this Court on

determined by the Court, but believed to be between $1,159,537.32 and $1,940,194.78 (*see* Pl.'s Am. Supp. Proposed Findings of Fact ¶ 25), in addition to punitive damages and attorney's fees. Creekstone, in turn, has brought a counterclaim against Abeles, alleging the following claims, all under New York law with the exception of the fourth claim: (1) goods sold and delivered; (2) *quantum meruit*; (3) fraud; (4) violation of the Packers and Stockyards Act of 1921 ("PSA"); and (5) breach of fiduciary duty and/or exclusive distributorship agreement, presuming that the Court determines that such an agreement exists.[4] On its goods sold and delivered claim, as well as its PSA claim, Creekstone seeks a sum to be determined by the Court, but no less than the alleged balance of $703,765.00 owed. On its breach of fiduciary duty claim, Creekstone seeks $6.6 million. Defendant also seeks interest on both amounts.

A bench trial was held from November 16 to November 19, 2009 and on November 23, 2009 to determine the parties' respective liability, if any. Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that plaintiff has failed to meet its burden of proof on any of its claims. The Court also concludes that defendant has proven its goods sold and delivered claim and the Court dismisses defendant's PSA claim as duplicative of that claim and as moot given the Court's decision on the goods sold and delivered claim. The Court concludes that defendant has failed to prove any of its other claims. Accordingly, the Court enters judgment in favor of defendant in the amount of $703,765 plus interest.[5]

I. BACKGROUND

On July 11, 2006, plaintiff filed its complaint in this action before the Supreme Court of the State of New York, Nassau County. On August 11, 2006, defendant removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. On November 20, 2006, plaintiff filed its second amended complaint, asserting claims of: (1) breach of a joint venture partnership; (2) breach of contract; (3) breach of fiduciary duty; (4) breach of the implied covenant of good faith and fair dealing; (5) conduct amounting to unfair competition; (6) unjust enrichment;

---

May 14, 2007. *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06 Civ. 3893 (JFB) (AKT), 2007 WL 1434990, at *8-9 (E.D.N.Y. May 14, 2007). Plaintiff's claims of unjust enrichment and *quantum meruit* were considered as one quasi-contract claim by this Court in that same decision. *Milton Abeles, Inc.*, 2007 WL 1434990, at *9. Familiarity with that decision is presumed.

[4] As discussed *infra*, defendant did not raise its quasi-contract claim or its fraud claim at trial and, thus, such claims have been abandoned. In any event, they fail on the merits.

[5] In its initial counterclaim, defendant asserted a claim for punitive damages against plaintiff, but defendant did not raise this issue at trial or in its proposed findings of fact and conclusions of law. Thus, such claim has been abandoned and, in any event, fails on the merits. Defendant also initially asserted a claim for attorney's fees. In its proposed findings of fact and conclusions of law, defendant states only that it "reserves the right" to move for attorney's fees. As defendant has not so moved, the Court need not address this issue at this time. To the extent plaintiff also seeks punitive damages and attorney's fees, such claims are denied because plaintiff, as discussed *infra*, has failed to prove liability on any of its claims.

2

and (7) *quantum meruit*. On December 1, 2006, defendant filed a motion to dismiss plaintiff's second amended complaint in its entirety. The Court dismissed plaintiff's fourth and fifth claims and combined its sixth and seventh claims in a Memorandum and Order issued on May 14, 2007. *See Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06 Civ. 3893 (JFB) (AKT), 2007 WL 1434990, at *8-9 (E.D.N.Y. May 14, 2007). On November 6, 2007, defendant filed an amended answer, asserting counterclaims of: (1) goods sold and delivered; (2) *quantum meruit*; (3) fraud; (4) violation of the Packers and Stockyards Act; and (5) breach of fiduciary duty and/or exclusive distributorship agreement. Plaintiff answered defendant's amended counterclaims on November 26, 2007.

Defendant moved for partial summary judgment on May 23, 2008. On June 23, 2008, plaintiff filed its opposition and cross-motion for partial summary judgment. By Memorandum and Order dated March 30, 2009, the Court denied both motions for summary judgment in their entirety because there were material disputed issues of fact that could not be resolved at the summary stage. *See Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV-3893, 2009 WL 875553 (E.D.N.Y. Mar. 30, 2009).[6]

A bench trial was held from November 16 to November 19, 2009 and on November 23, 2009. Plaintiff's case-in-chief included the live testimony of witnesses Richard Abeles, Christopher Fusco, Timothy Toussaint, Guy DeSantis, and Allan Marrus. Defendant cross-examined the live testimony of all of plaintiff's witnesses. Defendant's case included the live testimony of John Stewart and Steven Browne.

Plaintiff cross-examined both of defendant's witnesses. The parties' respective supplemental proposed findings of fact and conclusions of law were fully submitted by December 8, 2009. The Court has fully considered all of the evidence presented by the parties. Below are the Court's findings of fact and conclusions of law.

II. FINDINGS OF FACT

The following section constitutes findings of fact[7] by the Court and are drawn from witness testimony at trial, the parties' trial exhibits, including deposition designations and declarations admitted into evidence as trial exhibits ("Tr. Ex."), and from the undisputed facts submitted by the parties in the Joint Pre-Trial Order ("PTO").

At all relevant times, plaintiff Milton Abeles, Inc. processed and distributed meat and poultry products, including beef, from its locations in Mineola, New York and Port Washington, New York. (PTO, Stip. Facts ¶ 3.) Plaintiff is the "largest independent processor and distributor of prime beef in the country." (Trial Tr. at 18.) Richard Abeles is the chief executive officer of Milton Abeles, Inc. (*Id.* at 15.)

Defendant Creekstone produces and supplies high-quality beef to distributors, stores, supermarkets, hotels, restaurants, and end-consumers in the United States and abroad. (Def.'s Tr. Ex. 92 (hereinafter "J. Stewart Decl."), ¶ 2.) John Stewart was the founder of Creekstone and its chief executive officer from 1995 to the fall of 2006. (*Id.* ¶ 1.)

---

[6] Familiarity with that decision is presumed.

[7] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

3

Defendant started its beef business in 2001 with a focus on Asia but opened a plant in Kansas in 2003. (Trial Tr. at 377.) In 2003, defendant was "looking for all the customers that [it] could get at that time." (*Id.* at 379.) Defendant used "quite a few" distributors all over the country, including in the northeast. (*Id.* at 377-78, 407.) It was at this time, in mid-2003, that defendant spoke with Richard Abeles about Milton Abeles as a potential customer of Creekstone beef. (*Id.* at 379-80.) As a result, plaintiff began purchasing Creekstone beef from defendant in June 2003 and continued to do so until May 2006.[8] (*Id.* at 379-80; Def.'s Tr. Ex. 90 (hereinafter "O'Donnell Decl."), ¶ 3.) Defendant sold various grades of beef to plaintiff. (*See, e.g.*, Def.'s Tr. Ex. 1.) Plaintiff purchased about $30,000,000 worth of beef from defendant during this time period.[9]

(O'Donnell Decl. ¶ 11.) Plaintiff re-sold Creekstone beef to various customers using its contacts in the industry. (Trial Tr. at 256-60.)

Each time defendant sold and delivered beef to plaintiff, defendant included an invoice describing the products being purchased and the price for the products. (Def.'s Tr. Ex. 1; O'Donnell Decl. ¶ 11.) The invoices included the various terms of the sale, such as a provision that payment for defendant's product was due within seven days. (*Id.*) The invoices also provided that plaintiff must immediately notify defendant of any claim for refund or deduction. (*See* Def.'s Tr. Ex. 1.)

The parties experienced various problems during the course of their business dealings. Plaintiff frequently did not make timely payments, and defendant frequently demanded payment.[10] (O'Donnell Decl. ¶¶ 13-16.) Plaintiff did not deny that payment was due and instead assured defendant that payment was forthcoming. (Trial Tr. at 436-38.) Plaintiff was dissatisfied with some of the orders it received from defendant. (Trial Tr. at 97-98.) Some customers were dissatisfied with plaintiff's service and

---

[8] Plaintiff alleges that it began purchasing Creekstone beef pursuant to a joint venture or exclusive distribution agreement. As discussed *infra*, however, the Court finds, having reviewed and evaluated all of the evidence (including the testimony of all of the witnesses), that plaintiff has failed to prove by a preponderance of the evidence the existence of any joint venture or exclusive distribution agreement. For purposes of convenience (and to avoid unnecessary repetition in this Memorandum and Order), a discussion of the grounds for the Court's rejection of plaintiff's claim that there was a joint venture or exclusive distribution agreement is contained in the Conclusions of Law section.

[9] Plaintiff also purchased beef from other producers besides Creekstone. (*See* Trial Tr. at 192-201.) In fact, plaintiff "approved" of sixteen plants including Creekstone and accepted beef from seven premium black angus beef programs including Creekstone. (Def.'s Tr. Ex. 50.) Similarly, defendant sold beef to other customers besides Milton Abeles. (Trial Tr. at 377-78, 396-401, 429.) Plaintiff alleges that at least some of defendant's sales to other customers were in breach of the alleged joint venture or exclusive distribution agreement.

[10] There was no evidence that defendant put plaintiff on credit hold for making late payments. John Stewart testified that, although the terms of the individual sales agreements provided for payment in seven days, the average payment time for a customer was about fourteen days, and "we typically allowed it. We were a new company, starting out. We wanted to build sales." (Trial Tr. at 403.)

prices.[11] (*See* Def.'s Tr. Ex. 94 (hereinafter "Kiley Decl."), ¶¶ 6-8.)

In 2005, Wild by Nature, a specialty grocery store chain on Long Island affiliated with King Kullen (Kiley Decl. ¶¶ 1-2), contacted defendant about purchasing Creekstone natural beef. Defendant informed Wild by Nature that it could purchase Creekstone beef from plaintiff. (*Id.* ¶¶ 3-4; Def.'s Tr. Ex. 5.) Wild by Nature began buying beef from plaintiff in February 2006 on a trial basis. (Kiley Decl. ¶ 5.) In April 2006, Jim Kiley of Wild by Nature and Joe Forte of King Kullen went with Chris Fusco, a Milton Abeles sales representative, to defendant's facility in Kansas. (J. Stewart Decl. ¶ 23; Def.'s Tr. Ex. 15.) On the trip to Kansas, Forte told Fusco that King Kullen would not purchase Creekstone beef from plaintiff, but only from Bozzuto's, another distributor, and asked Kiley to do the same. Forte also stated that King Kullen and Wild By Nature already purchased most of their products from Bozzuto's. (Trial Tr. at 357; J. Stewart Decl. ¶¶ 24-25.)

In May 2006, Wild by Nature stopped purchasing Creekstone beef from plaintiff. (J. Stewart Decl. ¶ 26; Kiley Decl. ¶¶ 9-10; Trial Tr. at 391.) Wild by Nature made this decision because it was dissatisfied with plaintiff's prices and customer service. (Kiley Decl. ¶ 9.) On May 26, 2006, defendant began selling beef to Bozzuto's, which in turn sold beef to Wild by Nature. (*Id.* ¶ 10-11.)

Plaintiff stopped ordering Creekstone beef from defendant in late May 2006. (Trial Tr. at 232-33; O'Donnell Decl. ¶ 23.) Thereafter, plaintiff made no effort to obtain Creekstone beef from defendant or from any other distributor. (Trial Tr. at 232-33, 358-59.) At one point, plaintiff received Creekstone beef from another distributor and plaintiff returned it. (Trial Tr. at 235.) Plaintiff replaced Creekstone beef with Tyson's Certified Angus Beef "after a few phone calls and probably a few deliveries," (Trial Tr. at 457, 459-60), and plaintiff was able to fill every order for prime beef it received through 2007. (Trial Tr. at 113.)

As of May 21, 2006, plaintiff owed defendant $743,765 for shipments of Creekstone beef it had received from defendant. (Def.'s Tr. Ex. 1; Def.'s Tr. Ex. 91 (hereinafter "D. Stewart Decl."), ¶ 9.) At some point in June 2006, John Stewart, then-CEO of Creekstone, visited Richard Abeles to discuss collection of the amount due. (Trial Tr. at 393-94.) On June 7, 2006, Richard Abeles confirmed to Maxine O'Donnell, Creekstone Credit Manager, that plaintiff would pay the entire amount due. (O'Donnell Decl. ¶ 25; Def.'s Tr. Ex. 27.) Plaintiff subsequently made two payments to defendant totaling $40,000. (O'Donnell Decl. ¶ 26.) Plaintiff has not paid the remaining $703,765. (*Id.* ¶¶ 26-29.)

III. BURDEN OF PROOF

Plaintiff bears the burden of offering evidence in support of its claims of breach of

---

[11] Plaintiff alleges that defendant was to blame for plaintiff's price and service issues, and that defendant caused these problems in order to undermine plaintiff's relationship with customers like Wild by Nature in breach of the alleged joint venture or exclusive distribution agreement. (*See* Pl.'s Am. Supp. Proposed Findings of Fact ¶¶ 17-18.) The Court need not decide which party was at fault for these problems in order to resolve the parties' respective claims in this case because, as discussed *infra*, plaintiff has failed to prove the existence of a joint venture or exclusive distribution agreement.

5

a joint venture, breach of contract, breach of fiduciary duty, and quasi-contract and bears the burden of proving those allegations by a preponderance of the evidence. *See Mercury Partners LLC v. Pacific Med. Bldgs., L.P.*, No. 02 Civ. 6005, 2007 WL 2197830, at *8 (S.D.N.Y. July 31, 2007) ("Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence." (citing, *inter alia*, *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2d Cir. 1989))). Defendant bears the same burden on all of its breach of contract claims.

IV. CONCLUSIONS OF LAW

A. Plaintiff's Claims

For the reasons that follow, the Court concludes that plaintiff has failed to meet its burden on any of its claims against defendant.

1. Breach of Joint Venture

Plaintiff has failed to meet its burden of proof with respect to its claim of breach of a joint venture agreement. As the Second Circuit has observed, under New York law:

> The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses.

*Brown v. Cara*, 420 F.3d 148, 159-60 (2d Cir. 2005) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 584 (App. Div. 2003)); *see also SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d. Cir. 2004). "The absence of any one element 'is fatal to the establishment of a joint venture.'" *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citation omitted). As discussed below, after a careful examination of the evidence, the Court concludes that plaintiff has failed to show any of the indicia of a joint venture agreement.

a. Intention to Form a Joint Venture

Parties can evince their intent to be bound in a joint venture through a written or oral agreement. *See Milton Abeles*, 2009 WL 875553, at *5 (collecting cases). Intent need not be express but "may be implied from the totality of the conduct alleged . . . ." *Richbell*, 765 N.Y.S.2d at 584 (citing *Mendelson v. Feinman*, 531 N.Y.S.2d 326, 328 (App. Div. 1988)); *see SCS Commc'ns*, 360 F.3d at 342; *see also Sea Carriers Corp. v. Empire Programs, Inc.*, No. 04 Civ. 7395, 2008 U.S. Dist. LEXIS 49205, at *32 (S.D.N.Y. June 24, 2008); *DIRECTV Group, Inc. v. Darlene Inv., LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, at *6 (S.D.N.Y. Sept. 27, 2006). Where the alleged agreement is oral, parties may demonstrate their intent by combining their property and efforts in a manner such that they are necessarily subject to their joint venturers' corresponding efforts and potential failures. *See Kid Cloz, Inc.*, 320 F. Supp. 2d at 171 (citing *Zeising*, 152 F. Supp. 2d at 348).

After a careful examination of the evidence, the Court concludes that plaintiff

has failed to meet its burden of proving that there was an intent by both parties to form a joint venture. "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. There must be an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95-96 (2d Cir. 2007) (applying New York law). The only direct evidence of mutual assent to a joint venture or exclusive distribution agreement in this case was the testimony of Richard Abeles,[12] who testified that in June 2003, he and John Stewart agreed, over the telephone, to form a joint venture. (Trial Tr. at 33-34, 116.) The purpose of this alleged agreement was to benefit both parties by giving defendant access to plaintiff's customers and distribution networks and by growing plaintiff's business. (Trial Tr. at 33-35, 37-38.) John Stewart testified that he never agreed to form a joint venture or exclusive distribution agreement with plaintiff. (Trial Tr. at 382-83.) Because the testimony of Abeles and Stewart is wholly incompatible on this issue, the Court must determine, as the finder of fact, whose testimony to credit.

Having reviewed and evaluated all of the evidence (including the testimony and demeanor of all of the witnesses), the Court finds that Stewart's testimony is credible and that Abeles's testimony on this issue is not credible. On cross-examination, Abeles could not recall the date on which the alleged agreement was reached or the surrounding circumstances of the alleged phone call. (Trial Tr. at 116-17.) Abeles never visited Creekstone's facility prior to entering into the alleged agreement[13] (Trial Tr. at 117-18), nor did plaintiff do any financial analysis of the expected benefits from the alleged agreement, except a "rough calculation probably in [Abeles's] head." (Trial Tr. at 118-19.) There was no evidence that any Creekstone employees knew of a joint venture or exclusive distribution agreement. (O'Donnell Decl. ¶¶ 3-10; D. Stewart Decl. ¶¶ 14-24; Def.'s Tr. Ex. 93 (hereinafter "Buhlke Decl."), ¶¶ 2-13.) While Guy DeSantis and Chris Fusco, both Milton Abeles employees, testified that there was some kind of agreement between the parties,[14] neither of them knew the terms of

---

[12] Richard Abeles testified that he is the only living person at Milton Abeles who was aware of the alleged joint venture agreement. (Trial Tr. at 131-32.) Abeles also testified, as discussed *infra*, that "some of [his] people knew about some of the terms" of the agreement (*Id.* at 131-32), but that there was "no reason" for his employees to know about the terms because he believes that it is not "a salesman's position to necessarily know necessarily what [Abeles's] motives are." (*Id.* at 132.) Both Guy DeSantis, vice-president of Milton Abeles, and Chris Fusco, a Milton Abeles sales employee, testified that they had no knowledge of any terms of a joint venture or exclusive distribution agreement. (Fusco Dep. at 280:24-281:2; Trial Tr. at 458-59.)

[13] The only Milton Abeles employee to visit Creekstone's plant in Kansas was Chris Fusco, who did so in April 2006, near the end of the alleged agreement. (Trial Tr. at 117-18, 340.) Although Abeles testified that John and David Stewart visited plaintiff's facility at least once (Trial Tr. at 118), John Stewart testified that he never visited plaintiff's facility prior to the June 2006 visit regarding payment. (Trial Tr. at 384.) In any event, such a visit would not indicate the existence of a joint venture or exclusive distribution agreement.

[14] DeSantis testified that the parties had "I guess a joint thing" (Trial Tr. at 451), and Fusco testified that the parties had a "relationship" and that Abeles told him that the parties were "working together in building a brand and

7

such agreement and knew only what Richard Abeles told them. (Trial Tr. at 131-33, 458-59; Fusco Dep. at 280:24-281:2.)

Significantly, the alleged agreement was never reduced to writing (Trial Tr. at 36-37), nor was there any documentary evidence presented that referred to a joint venture or exclusive distribution agreement.[15] The Court concludes, in light of all of the other evidence, that the fact that the alleged agreement in this case was not reduced to writing makes it unlikely that the parties intended to reach any such agreement. Under New York law, in the absence of a written contract, the Court should consider several factors to decide whether the parties formed a contract: "'(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged agreement have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.'" *McElroy v. Gemark Alloy Refining Corp.*, 592 F. Supp. 2d 508, 518 (S.D.N.Y. 2008) (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d. Cir. 1986)); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) (noting that the factors identified in *Winston* "ordinarily guide our inquiry into whether parties intend to be bound in the absence of an executed writing"). The Court considers each factor in turn.[16]

The Court concludes that the alleged joint venture or exclusive distribution agreement is of the type that the parties likely would have reduced to writing. While Richard Abeles testified that informal oral agreements are common in the beef industry (Trial Tr. at 24-25, 36-37), he also admitted on cross-examination that he recalled entering into only one other exclusive distribution agreement during this time period and that this agreement was reduced to writing.[17] (Trial Tr. at 115-16, 160.)

---

building awareness." (Trial Tr. 273, 289.)

[15] Plaintiff places much emphasis on the fact that David Stewart, a sales manager at Creekstone and the son of John Stewart, referred to plaintiff as a "partner" in a May 2006 email. (Pl.'s Tr. Ex. 99.) In this email to Richard Abeles, David Stewart explains that defendant had problems with filling a recent order by plaintiff and closes: "[W]e are proud to have you as a partner. I appreciate your support and understanding at this time." (*Id.*) Stewart asserts that he used the term "partner" colloquially. (D. Stewart Decl. ¶ 23 ("When I was employed by Creekstone, I referred to Creekstone's customers as partners from time to time, but I did not mean that Creekstone and those customers had formed formal partnerships. Instead, I merely meant that Creekstone and its customers were (or should be) working cooperatively.").) In addition, there was evidence that both plaintiff and defendant used the term "partner" colloquially in their respective business dealings. (*See, e.g.*, Trial Tr. at 177-82 (Abeles), 439 (J. Stewart).) In any event, "calling an organization a partnership does not make it one." *Kidz Cloz*, 320 F. Supp. 2d at 174 (citation and quotation marks omitted). Therefore, the Court finds that in light of all of the evidence presented, defendant's use of the term "partner" in this email does not indicate that the parties had agreed to form a joint venture or exclusive distribution agreement.

[16] There is no evidence that the parties expressly reserved the right not be bound in the absence of a writing, and so this factor is not relevant here.

[17] John Stewart similarly testified that Creekstone entered into an exclusive distribution agreement with PFG, another distributor, in the New Jersey area and that this agreement was in writing. (Trial Tr. at 384-85, 395-96.)

8

Defendant offered into evidence this 1997 written agreement with Farmers' Pride, Inc.,[18] which clearly specified, *inter alia*, the agreement's terms, geographic scope, and duration. (Def.'s Tr. Ex. 64.) Thus, the Court finds that had the parties agreed to form a joint venture or exclusive distribution agreement in this case, which was to cover several years and involve the purchase of over $30,000,000 of Creekstone beef, they likely would have reduced such an agreement to writing. *See, e.g.*, *McElroy*, 592 F. Supp. 2d at 519 ("The magnitude and complexity of the proposed joint venture are sufficient to 'reflect a practical business need to record all the parties' commitments in definitive documents.'" (quoting *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984))); *Kidz Cloz*, 320 F. Supp. 2d at 173 ("[Plaintiff] had experience with formal partnerships and, consequently, must have understood the importance of written agreements. . . . If [plaintiff] had actually entered into such an agreement with [defendant], he would have undoubtedly reduced the agreement to writing as well.").

The fact that the terms of the alleged agreement are ill-defined also weighs against a finding that the parties intended to enter into an agreement. *See Winston*, 777 F.2d at 82 ("[T]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. That these 'unnoticed' or 'passed by' points of disagreement may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out." (internal citation, quotation marks, and alterations omitted)). Plaintiff presented very little evidence as to any specific obligations of the parties under the alleged agreement. For instance, plaintiff does not allege any agreement as to the quantity of beef to be purchased. (Trial Tr. at 141-42.) It is also unclear whether, under the alleged agreement, plaintiff was permitted to purchase and then re-sell prime boxed beef from sources other than defendant. (Trial Tr. at 36, 192-201.) Plaintiff does allege that defendant was prohibited from selling its beef in a certain geographic area. Plaintiff's evidence as to the geographic scope of the alleged agreement, however, was vague and contradictory. Plaintiff stated in its interrogatory response that the agreement covered New York, New Jersey, Connecticut, "and elsewhere." (Def.'s Tr. Ex. 41, at 5.) At trial, Richard Abeles testified that, in addition to the New York, New Jersey, and Connecticut tri-state area, the agreement covered Las Vegas, but he could not recall whether the agreement covered other areas. (Trial Tr. at 140-41.) Guy DeSantis, however, testified that he believed the alleged agreement actually prohibited plaintiff from selling in Manhattan and New England, though plaintiff tried to do so anyway. (Trial Tr. at 450-51). Chris Fusco also testified that the alleged agreement prohibited plaintiff from selling Creekstone beef anywhere north of Hartford, Connecticut. (Trial Tr. at 303.) Plaintiff's

---

[18] Plaintiff objected to the admissibility of this document on relevance grounds and the Court overruled the objection. (Trial Tr. at 160-61.) The 1997 written contract is clearly relevant to show plaintiff's usual course of dealing with respect to such agreements. In any event, even if the Court disregarded this document, it would not alter the Court's factual findings for the other reasons discussed *supra*.

evidence regarding the duration of the alleged agreement was also inconsistent. In plaintiff's interrogatory responses, plaintiff stated that the alleged agreement was intended to last five years (Def.'s Tr. Ex. 41, at 5), but at trial, Abeles testified that the agreement was renewed on a yearly basis and required nine months' notice to terminate. (Trial Tr. at 92-93, 185.) Thus, plaintiff's failure to present credible evidence as to the terms of the alleged joint venture or exclusive distribution agreement weighs against a finding that the parties intended to enter such an agreement.[19]

Plaintiff has also failed to show partial performance of the alleged agreement such that an intent to agree could be inferred. Plaintiff made efforts to find customers for Creekstone beef, and defendant sometimes directed customers to purchase beef from plaintiff. Defendant presented credible evidence, however, that there was nothing unique about these business dealings. As John Stewart credibly testified, defendant would send customer leads to a distributor like plaintiff "if we got the call, someone looking for a Creekstone product, and we didn't have the wherewithal to sell that customer directly."[20] (Trial Tr. at 409-10.) Similarly, distributors brought customer opportunities to defendant "all the time." (Trial Tr. at 412.) Thus, plaintiff has failed to prove that there was partial performance of a joint venture or exclusive distribution agreement between the parties, as opposed to the ordinary business dealings of a producer and distributor of beef. *See, e.g.*, *McElroy*, 592 F. Supp. 2d at 519 ("[Plaintiff's] activities on [defendant's] behalf, which he recounts at length in his motion papers, are equally consistent with his duties as an employee.") (finding no joint venture agreement).

In short, based on a careful review of the evidence, including an assessment of the witnesses' credibility, the Court finds that plaintiff has failed to prove by a preponderance of the evidence that the parties intended to form a joint venture or exclusive distribution agreement. Thus, all of plaintiff's claims based on a breach of the alleged joint venture or exclusive distribution agreement must fail. As discussed below, plaintiff has also failed to show any of the other indicia of a joint venture.

---

[19] When confronted on cross-examination with the lack of specificity of the terms of the alleged joint venture, Richard Abeles repeatedly referred to the qualifying statement in plaintiff's interrogatory response that the few terms of the alleged agreement identified in that response were "[a]mong other things." (Trial Tr. at 137-38, 243-44; Def.'s Tr. Ex. 41, at 4-5.) Assuming *arguendo* that plaintiff could provide details as to the alleged agreement's terms that were not provided in this interrogatory response, the fact remains that plaintiff failed to present credible evidence at trial as to the terms of the alleged agreement, as discussed above.

[20] Plaintiff emphasizes one instance in particular where a customer (Master Purveyors) sought to purchase 1,000 lbs. of beef directly from defendant, but defendant directed the customer to purchase the beef from plaintiff. (Trial Tr. at 66-67.) Plaintiff argues that this action indicates that defendant was not permitted to sell directly to Master Purveyors under the alleged agreement but rather had to sell through plaintiff. However, John Stewart credibly testified that defendant would not directly ship such a small amount of beef. (Trial Tr. at 441-42.) Thus, the example cited by plaintiff does not indicate the existence of a joint venture or an exclusive distribution agreement.

b. Mutual Contribution to the Joint Venture

Plaintiff has failed to show that the parties mutually contributed to the alleged joint venture through a combination of property, financial resources, effort, skill, or knowledge. There was no evidence that the parties combined property or financial resources. There was also no evidence presented that either plaintiff or defendant represented themselves as a joint venture to third parties.[21] The parties were not aware of the profit that the other enjoyed.[22] (Trial Tr. at 158.)

The parties had some discussions regarding pricing and plaintiff shared some customer information with defendant. Specifically, plaintiff argues that it gave defendant access to plaintiff's network of contacts in the industry and that this was unprecedented. (Trial Tr. at 33-34, 35-36, 39.) However, plaintiff has failed to prove that any such discussions were pursuant to a joint venture or exclusive distribution agreement. John Stewart credibly testified that sometimes "there was an opportunity to have discussion" about marketing issues with a distributor like plaintiff. (Trial Tr. at 420.) Furthermore, Chris Fusco testified that he only gave information on his industry contacts to defendant on two occasions, when the deals had already been solidified. (Trial Tr. at 354.) While there were also apparently some pricing discussions, John Stewart credibly testified that defendant did not have the authority to intervene in plaintiff's pricing to customers (Trial Tr. at 420), and David Stewart also stated that he "never directed Richard Abeles or anyone at Milton Abeles to set any price for the Creekstone beef that Milton Abeles sold to third parties." (D. Stewart Decl. ¶ 19.) The Court finds the testimony and sworn statements of the witnesses for defendant to be credible on this issue and concludes that the sharing of pricing information, in the context of all of the evidence in this case, is not reflective of the existence of a joint venture or exclusive distribution agreement.

c. Joint Proprietorship and Control

Plaintiff has also failed to show a measure of joint proprietorship and control over the alleged joint venture. There was no evidence that the parties formed a separate corporate entity for the joint venture and no evidence that the parties filed a joint tax return. (*See* Trial Tr. at 183.) As discussed above, the parties' conduct did not indicate the existence of joint ownership or control.[23]

---

[21] For instance, a Milton Abeles sales brochure admitted into evidence does not indicate any such agreement between plaintiff and defendant and instead lists Creekstone Farms as only one of sixteen beef plants approved by plaintiff's Quality Control Department. (See Def.'s Tr. Ex. 50; Trial Tr. at 179.) There was also no evidence that any third parties were aware of a joint venture or exclusive distribution agreement between plaintiff and defendant. For instance, Jim Kiley, a Wild by Nature store manager, stated that he was unaware of any joint venture agreement between plaintiff and defendant. (Kiley Decl. ¶ 13.)

[22] Richard Abeles admitted that plaintiff had "thousands of different prices" every week and that plaintiff did not "go through all those prices" with defendant. (Trial Tr. at 145-46.) Abeles also conceded that defendant priced its products according to its own inventory. (Abeles Dep. at 45:9-46:15.)

[23] Plaintiff emphasizes that, on one occasion, David Stewart told Fusco that Fusco "worked for Creekstone Farms and not Milton Abeles." (Trial Tr. at 273-74.) Plaintiff argues that this

### d. Sharing of Profits and Losses

Plaintiff has also failed to show that the parties agreed to share profits and losses. "An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (citing *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (1958)). However, a joint venture does not require precisely equal sharing of profits and losses. *Richbell*, 765 N.Y.S.2d at 584 ("[W]e reject defendants' contention that a joint venture requires an equal sharing."); *see also Dundes v. Fuersich*, 791 N.Y.S.2d 893, 895 (Sup. Ct. 2004) (citing *Richbell*, 765 N.Y.S.2d at 584). The Second Circuit, applying New York law, has determined that the loss of anticipated profits from a collaborative business endeavor alone does not constitute a shared loss under a joint venture agreement. *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 690 (2d Cir. 1983); *DeVito v. Pokoik*, 540 N.Y.S.2d 858 (App. Div. 1989). Moreover, if a party only stands to lose the individual services it invested in that business endeavor, it is not incurring a shared loss as required by a joint venture agreement. *Dinaco*, *Inc.*, 346 F.3d at 68; *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 175; *B. Lewis Prod. v. Angelou*, No. 01 Civ. 530 (MBM), 2003 WL 21709465, at *12 (S.D.N.Y. July 23, 2003), *aff'd in part*, 99 F. App'x 294 (2d Cir. 2004); *see also ARTCO, Inc. v. Kiddie, Inc.*, No. 88 Civ. 5734, 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) (noting that if "simply expending efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied . . .").

Plaintiff argues that the alleged joint venture provided that each party "would receive the profit margin that it would ordinarily earn in the course of business, but in the context of the object of the joint venture, which was to increase sales volume and market penetration for both." (Pl.'s Am. Supp. Proposed Findings of Fact ¶ 3 (citing Trial Tr. at 38).) Abeles testified that plaintiff hoped to make a ten percent profit on selling defendant's product (Trial Tr. at 73) but that plaintiff did not know what defendant's profits were.[24] (Trial Tr. at 74-75.) However, "it is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders' agreement would give rise to a joint venture." *Steinbeck*, 4 N.Y.2d at 317-18. Plaintiff has failed to prove that any discussions regarding pricing related to an agreement to share profits. Plaintiff also did not present written evidence of any financial calculations regarding the alleged agreement. Thus, in the absence of an agreement to share profits, plaintiff cannot prevail on a joint venture claim.

Plaintiff has also failed to show an agreement to share losses. Plaintiff points to several instances where it sold Creekstone

---

statement "best characterized" defendant's alleged right to "control and direct the activities of Abeles's sales personnel." (Pl.'s Am. Supp. Proposed Findings of Fact ¶ 2.) The Court concludes, however, in light of all of the other evidence, that this statement was nothing more than a colloquial reference to the fact that Fusco engaged in marketing of Creekstone beef.

[24] David Stewart told Richard Abeles that, in setting defendant's prices, defendant was setting the price that it "needed." (Trial Tr. at 74-75.)

product at a loss as evidence of an agreement to share losses. For instance, in some cases, plaintiff took product from defendant even when plaintiff would lose money on the transaction. (Trial Tr. at 40.) Plaintiff also sometimes took "padded invoices," or orders that were larger than requested. (Trial Tr. at 48.) Plaintiff has failed to prove, however, that such conduct indicated an agreement to share losses as opposed to the mere extension of "business courtesies." *See Dinaco*, 346 F.3d at 68.

In sum, plaintiff has failed to show any of the indicia of a joint venture agreement and, therefore, cannot prevail on its joint venture claim.

2. Breach of Exclusive Distribution Contract

As discussed above, plaintiff has failed to prove that the parties reached any agreement apart from the individual sales of beef evidenced by defendant's invoices. In short, the Court finds the evidence offered by plaintiff (including the testimony of Richard Abeles) regarding an alleged agreement – either for a joint venture or exclusive distribution agreement – not to be credible. Therefore, plaintiff's breach of contract claim based on an alleged exclusive distribution agreement must also fail.[25]

3. Breach of Fiduciary Duty

As the Court concludes that plaintiff has not proven the existence of a joint venture, no claim may lie for breach of fiduciary duty deriving from that alleged joint venture. *See Delaney v. Weston*, 888 N.Y.S.2d 466, 467 (App. Div. 2009) (holding that because there was no joint venture, "the breach of contract and breach of fiduciary duty claims (allegedly founded upon duties owed under the contractual, joint venture relationship) were properly dismissed"). Therefore, plaintiff also has failed to prove its breach of fiduciary duty claim.

4. Quasi-Contract

Plaintiff has also failed to prove its quasi-contract claim.[26] Plaintiff may only assert this claim in the absence of an agreement between the parties, be it oral, written, or implied-in-fact. *See, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (citing *Goldman v. Metro Life. Ins. Co.*, 807 N.Y.S.2d 583 (2005)). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (citation and internal quotation marks omitted)); *see also Beth Israel*, 448 F.3d at 586.

---

[25] Because plaintiff has failed to prove the existence of any exclusive distribution agreement, the Court need not determine whether that alleged agreement would be unenforceable under the Statute of Frauds.

[26] Plaintiff's second amended complaint pled claims of unjust enrichment and *quantum meruit*. The Court determined, however, in ruling on defendant's motion to dismiss in this action, that the two claims should be analyzed as a single quasi-contract claim. *See Milton Abeles, Inc.*, 2007 WL 1434990, at *9.

As a threshold matter, the Court concludes that plaintiff may not assert a quasi-contract claim because the parties' business dealings were already governed by the written invoices on each sale of Creekstone product. The invoices describe the various terms of sale (*see* Def.'s Tr. Ex. 1), and are valid and enforceable contracts. *See* N.Y. U.C.C. § 2-204(1) ("A contract for the sale of goods may be made in any manner sufficient to show agreement . . . ."); *M. Slavin & Sons Ltd. v. Glatt Gourmet Cuisine, Inc.*, 877 N.Y.S.2d 857, 859 (App. Div. 2009) (holding that a dated invoice reflecting, *inter alia*, the identities of the buyer and seller, a description of the goods, the amount of the goods, the price of the goods, and the payment terms constitutes a valid and enforceable contract under the U.C.C., and that the invoice constituted a writing in confirmation of a contract for the sale of goods in satisfaction of the Statute of Frauds). Therefore, plaintiff may not assert a quasi-contract claim.

Plaintiff also cannot recover on a quasi-contract claim because it has failed to prove the reasonable value of any services it provided defendant. While plaintiff expended time and effort to promote Creekstone beef (*see* Trial Tr. at 147-49), plaintiff has failed to prove the reasonable value of any such services.[27]

Richard Abeles testified that, while there were marketing costs associated with selling Creekstone beef that would have reduced plaintiff's gross profit, he did not know what those costs were. (Trial Tr. at 148.) Plaintiff's damages expert also admitted that he had done no analysis of the value of any services plaintiff had provided to defendant:

> Q. Did you do any analysis of the damages associated with Milton Abeles contributing its knowledge as a distributor in the tri-state area?
>
> A. I wouldn't know how to go about calculating that. That was part of the contribution to the joint venture that Milton Abeles was making.
>
> Q. Any analysis of any marketing spent on the part of Milton Abeles on behalf of Creekstone?
>
> A. No.
>
> Q. Any analysis of any advertising spent on behalf of Creekstone by Milton Abeles?
>
> A. No.
>
> Q. Any analysis of the value of services that Milton Abeles supposedly provided to Creekstone?

---

[27] Plaintiff cannot recover under a quasi-contract theory for alleged lost profits but rather only for the value of the services performed. *See Collins Tuttle and Co. v. Leucadia, Inc.*, 544 N.Y.S.2d 604, 605 (App. Div. 1989) ("While Supreme Court correctly observed that plaintiff's fourth cause of action is broad enough to state a claim based upon quasi-contract, its conclusion that plaintiff might recover half of the brokerage commission on that basis is in error. Recovery on a claim premised upon quasi-contract or unjust enrichment is limited to the reasonable value of the services rendered by the plaintiff. In view of Supreme Court's finding pursuant to CPLR 3212(g) that there was no exclusive sales agency agreement between the parties, measurement of plaintiff's recovery on the basis of one-half of the brokerage commission actually paid is entirely inappropriate." (internal citations omitted)).

> A. Again, I'm not sure what that would encompass.
>
> Q. So you didn't do the analysis?
>
> A. No, I did not. But I don't understand the question so I'm not sure I could have done the analysis.

(Trial Tr. at 488-89.) The little evidence plaintiff did present as to the value of services it provided defendant indicates that its expenses were *de minimis*. (*See* Trial Tr. at 148-50.) Plaintiff's failure to prove the reasonable value of any services expended on behalf of defendant defeats any quasi-contract claim.

Finally, plaintiff also cannot recover on a quasi-contract claim because plaintiff's marketing activities were of only incidental benefit to defendant and were not done at defendant's behest. For a quasi-contract claim "[i]t is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Kagan v. K Tel Entm't, Inc.*, 568 N.Y.S.2d 756, 757 (App. Div. 1991) (internal citations omitted). Thus, if the benefit enjoyed by the defendant is "purely incidental," the plaintiff has not carried its burden. *See Clark v. Daby*, 751 N.Y.S.2d 622, 623-24 (App. Div. 2002). Here, while plaintiff expended time and effort in developing a market for Creekstone beef, such activity clearly was of benefit to plaintiff, which earned roughly a ten percent profit on its sales of Creekstone beef. (Trial Tr. at 74.) For a distributor like plaintiff, marketing a product is necessary for the distributor to make a profit, even if a producer like defendant benefits incidentally. *See, e.g.*, *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 167 (S.D.N.Y. 1998) ("In this case, the performance at issue is [plaintiff's] creation of demand in Scandinavia for Calvin Klein jeans, a performance indisputably not rendered for the defendants. On the contrary, [plaintiff] performed for its own benefit and perhaps the benefit of its customers and its contract partners .... Defendants' actions in tapping into the demand created by [plaintiff] therefore cannot give rise to a claim for quasi-contractual relief."). Furthermore, there was credible evidence that defendant was uninterested in plaintiff's activities and that plaintiff's activities were therefore, at least in part, not at defendant's behest.[28] Thus, plaintiff cannot recover on a quasi-contract theory for its marketing activities, or any other activities, in connection with Creekstone beef.

### B. Creekstone's Counterclaims

### 1. Goods Sold and Delivered[29]

---

[28] Chris Fusco testified at length that defendant did not assist him in his marketing efforts. Fusco testified, for example, that "[t]here were a number of occasions that I asked Creekstone to come along on sales, and there was no show. There were numerous times I sent emails, numerous phone calls I placed to Creekstone, which they either ignored and never got back to me." (Trial Tr. at 266). And "every time I called [one of defendant's employees], he would never answer me. I would send him emails, and on a very rare occasion would he send me emails back." (Trial Tr. at 307.)

[29] Even if defendant had not abandoned its punitive damages claim, the Court denies such an award on the merits. "Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assur. Soc'y*, 634 N.E.2d 940, 943 (N.Y. 1994). "Thus, a private party seeking to

Under the U.C.C., a seller is entitled to payment and a buyer is required to pay when the seller sells and delivers goods to the buyer, which the buyer then accepts. N.Y. U.C.C. § 2-607(1); *Conoco Phillips v. 261 Merrick Road Corp.*, 428 F. Supp. 2d 111, 126 (E.D.N.Y. 2006) (stating that the essential elements of a goods sold and delivered claim are "'the purchase, sale and delivery of goods at an established price and nonpayment therefor'" (quoting *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629 (NRB), 2004 WL 830079, at *2 (S.D.N.Y. Apr. 13, 2004))). However, a buyer may, after providing proper notice to the seller, "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the contract." N.Y. U.C.C. § 2-717; *Laish, Ltd. v. Jafora-Tabori, Ltd.*, No. 02 Civ. 1322 (SLT) (MDG), 2006 WL 270250, at *4 (E.D.N.Y. Feb. 1, 2006).

Defendant has proven that it sold and delivered goods to plaintiff, that plaintiff accepted the goods and has not paid for them, and that the value of the goods is $703,765. (*See, e.g.*, Def.'s Tr. Ex. 90, O'Donnell Decl. ¶¶ 17-29.) As plaintiff's counsel conceded (*see* Trial Tr. at 572), there was no evidence presented that the shipments at issue were returned to plaintiff by customers or had to be destroyed. Moreover, plaintiff does not dispute that it has failed to pay the amount in question. Indeed, plaintiff's expert conceded that "a significant number is owed to Creekstone, it might be 703 or 680," and it is "in accounts payable." (Trial Tr. at 485-86.) Plaintiff argues, however, that "[a]ny damages that Creekstone might be entitled to under a claim of Goods Sold and Delivered is offset by damages incurred by Abeles." (Pl.'s Am. Supp. Proposed Findings of Fact ¶ 32.) As discussed above, however, plaintiff has failed to prove any of its claims against defendant. Therefore, defendant is entitled to judgment against plaintiff in the amount of $703,765 plus interest.[30]

2. Packers and Stockyards Act

Defendant's PSA claim is based on the same conduct by plaintiff and seeks the same $703,765 in damages. Because the Court concludes that defendant is entitled to that amount on its goods sold and delivered claim, the Court dismisses defendant's PSA claim as duplicative and moot. *See, e.g.*, *E*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 388 (S.D.N.Y. 2009) (after bench trial, dismissing plaintiff's good faith and fair dealing claim as duplicative of plaintiff's successful breach of contract claim).

---

recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *United States ex rel Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996). Because defendant has made no showing of any pattern of conduct by plaintiff directed at the public, any request for punitive damages is denied.

[30] Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract," and the interest is to be computed "from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001. Interest also accrues post-judgment. *Id.* §§ 5002-5003. The date from which interest is to be computed is May 28, 2006 (seven days after the date of the last invoice that was sent by defendant to plaintiff). (*See* Def.'s Revised Proposed Findings of Fact and Conclusions of Law, ¶ 22.) The statutory rate of interest is nine percent. N.Y. C.P.L.R. § 5004.

### 3. Breach of Fiduciary Duty

Defendant's breach of fiduciary duty claim depends on the Court finding that a joint venture existed and that plaintiff breached its duty to defendant. Because the Court finds that no joint venture existed, defendant's breach of fiduciary duty claim fails. *See Delaney v. Weston*, 888 N.Y.S.2d at 467.[31]

### V. CONCLUSION

In sum, plaintiff has failed to prove by a preponderance of the evidence that the defendant breached an alleged joint venture agreement or a fiduciary duty arising from the alleged joint venture, and has failed to prove its breach of contract and quasi-contract claims. Accordingly, the Court finds in favor of defendant on all of plaintiff's claims. As to defendant's counterclaims, defendant has proven its goods sold and delivered claim by a preponderance of the evidence in the amount of $703,765 plus interest from May 28, 2006.

---

[31] As noted *supra*, defendant has abandoned its quasi-contract and fraud claims. For instance, defendant makes no reference to either claim in its proposed findings of fact and conclusions of law. In any event, defendant has failed to prove any claim of quasi-contract or fraud. With respect to the quasi-contract claim, as discussed above, the Court finds that the parties' dealings were governed by defendant's invoices, and so no quasi-contract claim may lie. *See Beth Israel*, 448 F.3d at 586. With respect to the fraud claim, under New York law, "a plaintiff alleging fraud must prove by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). As defendant did not specifically raise this claim during trial and has also failed to prove that plaintiff acted with a fraudulent state of mind, defendant's fraud claim fails.

Defendant's counterclaim under the Packers and Stockyards Act is dismissed as duplicative of the goods sold and delivered claim and as moot. Defendant has failed to prove its breach of fiduciary duty, quasi-contract, and fraud claims, and so the Court finds in favor of plaintiff on these counterclaims. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 1, 2010
Central Islip, New York

\* \* \*

The attorney for plaintiff is Steven L. Levitt, Esq., Steven L. Levitt & Associates, P.C., Two Hillside Avenue, Building F, Williston Park, New York 11596. The attorney for defendant is Matthew Solum, Esq., Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022.